1    **WO**

2

3

4

5

6            **IN THE UNITED STATES DISTRICT COURT**

7               **FOR THE DISTRICT OF ARIZONA**

8

9   Christian Copyright Licensing International    No. CV-23-00368-PHX-DWL
   LLC,

10                Plaintiff,           **ORDER**

11

12   v.

13   Multitracks.com LLC,

14               Defendant.

15        Since at least 2012, Multitracks.com LLC ("MTC") has used the term

16 MUTILTRACKS.COM (the "Mark") to market its goods and services, including through

17 the use of that term as a website domain name. In 2021, Christian Copyright Licensing

18 International ("CCLI") obtained the domain name multitrack.com from a non-party who

19 had registered it decades earlier. CCLI initially used that domain name to redirect visitors

20 to the website of one of its affiliate companies, OmniSonic Media Group, LLC d/b/a Loop

21 Community ("Loop Community"), which is one of MTC's competitors. In this action,

22 CCLI contends that its use of the multitrack.com domain name is lawful and seeks

23 declaratory relief to that effect. MTC contends that CCLI's use of the multitrack.com

24 domain name amounts to cybersquatting in violation of the Anticybersquatting Consumer

25 Protection Act ("ACPA") and seeks monetary damages.

26        Now pending before the Court are (1) the parties' stipulated motion to file certain

27 documents under seal, (2) MTC's motion to exclude the opinions of Dr. Samantha Iyengar

28 ("Dr. Iyengar"), (3) CCLI's motion for summary judgment, and (4) MTC's cross-motion

for partial summary judgment.  For the reasons that follow, the first, second, and fourth motions are denied and the third is granted in part and denied in part.

BACKGROUND

I.    <u>Relevant Factual Background</u>

CCLI is a limited liability company that provides copyright licenses to facilitate worship services across the United States.  (Doc. 57-22 at 2.)  Its parent company is StarPraise Group, LLC ("StarPraise").  (Doc. 57-3 at 89.)  As part of its marketing strategy, CCLI acquires "generic descriptor domains that point to various products and services throughout [its] family of companies."  (*Id.* at 11-12.)

MTC was founded in 2006 as "Interactive Worship Live LLC" (Doc. 57-20 at 2-4) but changed its name to "MultiTracks.com" in 2011 (Doc. 57-21 at 2-4).  MTC is a limited liability company that offers products and services, including "multitracks," for use in worship services.  (Doc. 61-1 at 4 ¶ 8 ["[T]he tracks we offer could also be referred to (though not precisely as explained below) as a 'multi-track . . . .'"]).  MTC is an industry leader and has spent time and resources building its brand.  (Doc. 61-4 ¶ 8; Doc. 61-5 ¶¶ 3-7; Doc. 61-1 at 38-67 [showing recognition in worship magazines])

The noun "multitrack" is used in the music industry to denote a class of audio files.  Although the parties disagree somewhat as to the precise contours of this class of products, they appear to agree that multitracks include single audio recordings composed of multiple individual audio stems or tracks.  (Doc. 57 at 7 ["The term 'multitrack' means an audio recording that 'us[es] more than one audio track.'"]); Doc 61 at 6-7 ["[T]here is some confusion on these terms because in the recording world, 'multitracks' means a collection of raw individual tracks, and in the multitracks/playback world, that same word means a collection of stems."]).  Additionally, Phillip Edwards ("Edwards"), MTC's CEO, appears to contend that the term includes the individual stems or tracks themselves.  (Doc 57-2 at 4; Doc. 61-1 at 6-7 ¶ 16.)  The undisputed dictionary definition included in the record supports this conceptualization.  (Doc. 57-1 at 2-3 [defining multitrack as "using more than one audio track"]).

In 2020, StarPraise acquired Loop Community.  (Doc. 1 ¶ 7; Doc. 11 ¶ 7; Doc. 57-3 at 4-5.)  Loop Community and MTC are competitors.  (Doc. 57-2 at 5; Doc. 61-6 at 6.)

In 2021, CCLI's Chief Technology Officer, George Ross ("Ross"), used the domain-name broker service GoDaddy to obtain the domain name multitrack.com via a transfer.  (Doc. 1 ¶ 19; Doc. 11 ¶ 19; Doc. 61-6 at 8.)  That domain name was originally registered by a non-party in the 1990s.  (Doc. 57-2 at 9 ["We [MTC] definitely saw the domain name before, and it had a very interesting, outdated web page.  It was kind of circa 1995 or mid '90s."]; Doc. 71-4 [screenshot of the webpage appearing at www.multitrack.com as of July 2002].)

Initially, CCLI caused the multitrack.com domain name to automatically redirect visitors to loopcommunity.com, a website operated by Loop Community where consumers can view and purchase multitrack products.  (Doc. 1 ¶ 20; Doc. 11 ¶ 20; Doc. 57-3 at 14.)  At the time he obtained the multitrack.com domain name in 2021, Ross knew "both of the existence of [MTC's] webpage and the goods and services offered by [MTC]."  (Doc. 61-6 at 11.)

On March 29, 2022, Ross received a phone call from Steve McPherson ("McPherson"), MTC's Director of Global Licensing and Partnerships.  (Doc. 57-24 at 3 ¶ 7.)  During the phone call, McPherson asked Ross to stop the multitrack.com domain name from resolving to loopcommunity.com.  (Id. at 3 ¶ 9.)  Ross agreed to do so—assertedly "not out of any legal obligation" but as a friendly gesture due to his "pre-existing personal relationship with Mr. McPherson"—and caused the multitrack.com domain name to resolve to worshipfuel.com, which is a blog owned and maintained by CCLI and to which Loop Community contributes.  (Id. at 3 ¶¶ 10-11.)

On November 21, 2022, MTC filed a complaint against CCLI before "Forum," a private dispute-resolution company, seeking an order requiring GoDaddy to transfer the domain name multitrack.com to MTC pursuant to the Uniform Domain-Name Dispute Resolution Policy ("UDRP") of the Internet Corporation for Assigned Names and Numbers ("ICANN").  (Doc. 57-27.)  In its UDRP complaint, MTC claimed to have trademark rights

in three marks it had been attempting to register with the United States Patent and Trademark Office ("PTO"): Multitracks.com, "Multitracks Cloud," and "Multitracks Streaming." (*Id.* at 4.)

On February 19, 2023, the Forum arbitrator granted MTC's UDRP Complaint and ordered the transfer of the domain name multitrack.com to MTC. (Doc. 1 ¶ 45; Doc. 11 ¶ 45.)

II.    Procedural Background

On March 1, 2023, CCLI initiated this action by filing the complaint, which seeks "an order declaring that CCLI's use of the domain name multitrack.com is not unlawful, within the meaning of the ACPA." (Doc. 1 at 8.)

On April 11, 2023, MTC filed an answer and counterclaim. (Doc. 11.) In its counterclaim, MTC alleges that CCLI's use of the domain name multitrack.com is "designed and intended to create confusion" with the Mark, that CCLI had "a bad faith intent to profit from" the Mark, and that CCLI is using the domain name multitrack.com "to divert consumers from [MTC's] online location for commercial gain and to damage [MTC's] goodwill." (*Id.* at 9 ¶¶ 10-15.) MTC requests damages, an order that CCLI forfeit the multitrack.com domain name, and attorneys' costs and fees. (*Id.* ¶ 18.)

On September 16, 2024, the parties filed a joint stipulation to file certain documents under seal. (Doc. 59.)

That same day, CCLI filed the pending motion for summary judgment (Doc. 57) and motion to exclude the opinions of Dr. Iyengar (Doc. 60) and MTC filed the pending cross-motion for partial summary judgment (Doc. 61).

All three motions are now fully briefed. (Docs. 62, 65, 68, 69, 70, 71.)

On May 19, 2025, the Court issued a tentative ruling. (Doc. 75.)

On June 4, 2025, the parties filed a stipulation to vacate oral argument and issue a final order based om the tentative ruling. (Doc. 76.)

…

…

**DISCUSSION**

I.    <u>Stipulation To File Documents Under Seal</u>

    A.    **Legal Standard**

The public has a general right to inspect judicial records and documents, such that a party seeking to seal a judicial record must overcome "a strong presumption in favor of access." *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006). To do so, the party must "articulate compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure." *Id.* at 1178-79 (internal quotation marks and citations omitted). The Court must then "conscientiously balance the competing interests of the public and the party who seeks to keep certain judicial records secret." *Id.* at 1179 (internal quotation marks omitted). "After considering these interests, if the court decides to seal certain judicial records, it must base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture." *Id.* (internal quotation marks omitted).

The "stringent" compelling reasons standard applies to all filed motions and their attachments where the motion is "more than tangentially related to the merits of a case." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096, 1101 (9th Cir. 2016). A motion for summary judgment is clearly such a motion, so the compelling reasons standard applies to the sealing request here.

    B.    **Analysis**

The parties "stipulate and agree" to file under seal Exhibits 35 and 38 to CCLI's motion for summary judgment as well as an unredacted version of the motion itself. (Doc. 58.) According to the parties, sealing is warranted because Exhibit 35 contains "certain financial information regarding MTC's advertising and marketing," Exhibit 38 contains "certain information regarding MTC's number of customer accounts and website visitors," and the motion "recites two numbers contained in Exhibit 35." (*Id.* at 2.) MTC asserts, without corroboration or elaboration, that public disclosure of these numbers "might harm [its] competitive standing." (*Id.*) The parties also note that MTC designated Exhibits 35

and 38 as "CONFIDENTIAL—COUNSEL'S EYES ONLY" under the protective order issued in this case.  (*Id.*)

The parties' sealing request is denied.  As an initial matter, that a sealing request is stipulated or unopposed does not weigh in favor of sealing.  *See generally Lipocine Inc. v. Clarus Therapeutics, Inc.*, 2020 WL 4569473, *7 (D. Del. 2020) ("The problem for judges is that [sealing] requests are seldom opposed—the would-be opposing party has access to the materials and doesn't particularly care whether the public has access as well. . . .  That leaves the judge in the position of having to decide a sometimes complex issue of sealing or redaction with no adversarial briefing and often, as in this case, with only a perfunctory submission from the party seeking relief."); *TriQuint Semiconductor, Inc. v. Avago Techs. Ltd.*, 2010 WL 2474387, *1 (D. Ariz. 2010) (rejecting sealing request premised on the parties' "side agreement" as to sealing).  Likewise, "the mere fact the parties have designated certain materials or information as confidential pursuant to [the protective order] does not establish that any legal standard for placing those materials or information under seal has been met."  (Doc. 28 at 6.)

On the merits, the parties have failed to "articulate compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure."  *Kamakana*, 447 F.3d at 1178-79.  MTC contends in conclusory fashion that disclosure of its advertising and marketing expenditures and its number of customer accounts and website visitors might harm its competitive standing but provides no factual basis for this claim.  This is insufficient to satisfy the "stringent" compelling reasons standard.  *Joy v. North*, 692 F.2d 880, 894 (2d Cir. 1982) ("[A] naked conclusory statement that publication . . . will injure the bank in the industry and local community falls woefully short of the kind of showing which raises even an arguable issue as to whether it may be kept under seal.") (quoted with approval in *Oliner v. Kontrabecki*, 745 F.3d 1024, 1026-27 (9th Cir. 2014)); *Primus Grp., Inc. v. Inst. for Env't Health, Inc.*, 395 F. Supp. 3d 1243, 1270 (N.D. Cal. 2019) ("conclusory allegations of harm" did not "outweigh the public's right of access").

- 6 -

1    Moreover, the numerical information the parties seek to file under seal is at issue in

2    this litigation.  As discussed in more detail below, as part of the test for determining

3    whether a descriptive term has secondary meaning, courts examine, among other facts, the

4    "amount and manner of advertising" and the "amount of sales and number of customers."

5    *P & P Imports LLC v. Johnson Enterprises, LLC*, 46 F.4th 953, 961 (9th Cir. 2022) (cleaned

6    up).  The parties have briefed these exact issues in their summary judgment submissions.

7    (Doc. 57 at 15-16; Doc. 69 at 10-11.)  This undermines the rationale for keeping this

8    information under seal.  *See, e.g.*, *Shapiro v. Hasbro Inc.*, 2016 WL 9137526, *3 (C.D.

9    Cal. 2016) ("Hasbro put these documents at issue in the litigation and thus fails to . . . make

10    a particularized showing of compelling reason[s] to file these exhibits under seal."); *B.F.

11    v. Amazon.com, Inc.*, 2019 WL 4597492, *2 (W.D. Wash. 2019) ("By bringing this lawsuit

12    against Defendants, [Plaintiffs] have put [information sought to be sealed] directly at issue,

13    and cannot reasonably expect filings in this case not to include details about [that

14    information].").

15    Under LRCiv 5.6(e), if a sealing "request is denied in full, the submitting party may,

16    within five (5) days of the entry of the order denying the request, resubmit the document

17    for filing in the public record."  Accordingly, within five days of the issuance of this order,

18    CCLI shall resubmit its unredacted summary judgment motion and unredacted versions of

19    Exhibits 35 and 38 to it summary judgment motion.

20    II.    MTC's Motion To Exclude

21        A.    **Dr. Iyengar's Responding Report**

22    One of the disputed issues in this case is whether the Mark (*i.e.*, the term

23    multitracks.com) is generic or merely descriptive without secondary meaning, such that it

24    cannot function as a trademark.  In an effort to demonstrate that this term is not generic,

25    MTC retained Dr. Isabella Cunningham ("Dr. Cunningham") to conduct a survey, which

26    broadly followed the so-called "Teflon"[1] survey protocol.  (Doc. 62 at 6 [CCLI's

27    _____

28    [1]    Teflon surveys are named after the consumer survey used in *E. I. DuPont de
    Nemours & Co. v. Yoshida Int'l, Inc.*, 393 F. Supp. 502 (E.D.N.Y. 1975).  Such surveys
    have "since become a widely accepted and persuasive way to present evidence of
    genericness or lack thereof."  *Orgain, Inc. v. N. Innovations Holding Corp.*, 2021 WL

acknowledgement that Dr. Cunningham "conducted a Teflon (genericness) survey"].) More specifically, and as both sides acknowledge, Dr. Cunningham modeled her survey on the Teflon survey conducted by Dr. Hal Poret in *United States Pat. & Trademark Off. v. Booking.com B. V.*, 591 U.S. 549 (2020). (Doc. 60 at 5; Doc. 62 at 3-4.) Dr. Cunningham's survey begins by asking demographic and background questions. (Doc. 60-6 at 21-27.) It then proceeds to define the difference between "common" and "brand" names and to test participants' understanding of this difference. (*Id.* at 30-32.) It then presents a series of names, including the Mark and various "comparison names," and asks participants to decide whether each name is a "common name" or a "brand name." (*Id.* at 33-36.) Last, it asks some administrative questions. (*Id.* at 37-40.)

CCLI retained its own expert, Dr. Iyengar, to criticize Dr. Cunningham's report and conclusions. (Doc. 57-31 [Dr. Iyengar's report].) According to Dr. Iyengar, Dr. Cunningham's "survey is unreliable because it violates generally accepted principles for surveys used as evidence in litigation and cannot be used to support her conclusions, including any conclusion that the alleged mark (1) is not generic, and (2) has established secondary meaning." (*Id.* at 7.) Dr. Iyengar identifies three purported flaws in Dr. Cunningham's methodology: (1) "[f]ailure to survey the relevant population of consumers—specifically, surveying an overinclusive universe (churchgoers) with no way to narrow it down to worship leaders or other decisionmakers in the relevant market"; (2) "[f]ailure to present the mark within the proper frame of reference"; and (3) "[f]ailure to include appropriate comparison names." (*Id.*)

B.    **Legal Standard**

"The party offering expert testimony has the burden of establishing its admissibility." *Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012). Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion

---

1321653, *8 (C.D. Cal. 2021).

or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert has reliably applied the principles and methods to the facts of the case."

(*Id.*)

A district court's decision to admit or exclude expert testimony is guided by a two-part test that focuses on the opinion's relevance and reliability. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "The inquiry envisioned by Rule 702 is . . . a flexible one." *Id.* at 594. "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595.

Evidence is relevant if it "'has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id.* at 587 (quoting Fed. R. Evid. 401). "The Rule's basic standard of relevance thus is a liberal one." *Id.* "Applying a higher standard than helpfulness to otherwise reliable expert testimony is unnecessarily strict." Fed. R. Evid. 702, advisory committee note to 2023 amendments.

The basic standard of reliability is similarly broad. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). *See also* Fed. R. Evid. 702, advisory committee note to 2000 amendments ("[P]roponents do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct,

they only have to demonstrate by a preponderance of evidence that their opinions are reliable . . . .  The evidentiary requirement of reliability is lower than the merits standard of correctness.") (citation and internal quotation marks omitted).

Nevertheless, courts serve an important "gatekeeper" role when it comes to screening expert testimony.  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).  "Unlike an ordinary witness, . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."  *Daubert*, 509 U.S. at 592.  "Presumably, this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline."  *Id.*  This "general 'gatekeeping' obligation . . . applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

The Court has "broad discretion," both in deciding whether the evidence is reliable and in deciding how to test for reliability.  *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000).  In *Daubert*, the Supreme Court listed various factors that might be applicable, including whether the expert's technique or theory (1) can be tested; (2) has been peer reviewed or published; (3) has a known or potential basis for error; and (4) is generally accepted in the pertinent scientific community.  509 U.S. at 593-94.  However, "[t]he *Daubert* factors were not intended to be exhaustive nor to apply in every case."  *Hankey*, 203 F.3d at 1168.  In particular, "[t]he *Daubert* factors . . . simply are not applicable to [testimony] whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it."  *Id.* at 1169.  *See also* Fed. R. Evid. 702, advisory committee note to 2000 amendments ("Some types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others.  Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise.").

The bottom line is that "[t]he trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." *See* Fed. R. Evid. 702, advisory committee note to 2000 amendments. However, "nothing . . . requires the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support. The . . . standard does not require perfection." Fed. R. Evid. 702, advisory committee note to 2023 amendments.

C. **Timeliness**

1. The Parties' Arguments

MTC filed the motion to exclude Dr. Iyengar's opinions on September 16, 2024. (Doc. 60.) In response, CCLI argues that because the deadline in the scheduling order to file expert-exclusion motions was August 29, 2024, and "MTC did not file a motion to extend the . . . deadline" or make "any showing of excusable neglect," "the motion should be denied as untimely." (Doc. 62 at 7.)

In reply, MTC argues that "the Court should treat the Motion as timely filed and rule on the merits of the Motion." (Doc. 65 at 1-2.) MTC concedes the motion was untimely under the scheduling order but ascribes the untimeliness to its own good-faith docketing error. (*Id.* at 9.) MTC argues that the late filing "does not diminish the efficient management or resolution of this matter—and i[n] fact furthers it"—and that "when a *Daubert* motion 'raise[s] serious challenges . . . which go to the heart of the case,' then a technical deviation from the Court's order 'should not result in the striking or refusal to consider a motion to exclude.'" (*Id.* at 10.) Last, MTC contends that it "did not act in a dilatory manner" because "Dr. Iyengar did not submit her affidavit of changes to her deposition testimony until September 4, 2024" and that affidavit was "not delivered by the court reporter to undersigned counsel until September 12, 2024," only four days before the filing date. (*Id.* at 10 n.8.)

…

1          2.    Analysis

2          An initial difficulty in evaluating the parties' timeliness arguments is that neither

3    side invokes the correct standard.  Under the scheduling order in this case, "[a]ny motions

4    challenging expert testimony must be filed no later than 28 days after the deadline for close

5    of expert discovery."  (Doc. 22 at 4.)  The ultimate deadline for the close of expert

6    discovery, following several extensions requested by the parties, was August 1, 2024.

7    (Doc. 53.)  Thus, expert exclusion motions were due by August 29, 2024.  However, the

8    motion at issue here was not filed until September 16, 2024.

9          Although CCLI argues that the timeliness analysis turns on whether MTC can

10   establish "excusable neglect" for missing the August 29, 2024 deadline and MTC seems to

11   argue that excusable neglect exists because it made a good-faith calendaring error, these

12   arguments overlook that the missed deadline was established via a Rule 16 scheduling

13   order.  Under Ninth Circuit law, such deadlines "shall not be modified except by leave of

14   the district court upon a showing of good cause." *Johnson v. Mammoth Recreations, Inc.*,

15   975 F.2d 604, 608 (9th Cir. 1992) (cleaned up).  This "standard primarily considers the

16   diligence of the party seeking the amendment . . . .  [C]arelessness is not compatible with

17   a finding of diligence and offers no reason for a grant of relief. . . .  If [the moving party]

18   was not diligent, the inquiry should end." *Id.* at 609.  Thus, courts have refused to allow

19   parties to rely on calendaring errors as the basis for filing dispositive motions or disclosing

20   expert reports after the relevant deadline set forth in a scheduling order, on the ground that

21   calendaring errors ordinarily reflect a lack of diligence.  *See, e.g.*, *Ski Lifts, Inc. v. Schaeffer

22   Mfg. Co.*, 2020 WL 978505, *2 (W.D. Wash. 2020) ("Plaintiff's justification for its

23   untimely [dispositive motion] filing rests on the legal assistant's calendaring error.  While

24   Plaintiff may be correct that delegating certain matters is 'not completely novel' in modern

25   legal practices, delegation does not absolve Plaintiff from its responsibility to comply with

26   the Court's deadlines.  And the calendaring error Plaintiff relies on, regardless of origin,

27   does not constitute good cause under Rule 16.") (cleaned up); *Hubbard v. Twin Oaks

28   Health & Rehabilitation Ctr.*, 2004 WL 3643820, *1 (E.D. Cal. 2004) ("Good cause may

be established if the defendants show that they could not reasonabl[y] meet the expert disclosure deadline despite their diligence.  Here, defendants provide no showing of good cause, but instead admit that a calendaring error and lack of due diligence are the cause of their oversight of the expert designation deadline.").  *See generally Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*, 218 F.R.D. 667, 674 (C.D. Cal. 2003) ("Several courts have held that 'good cause' requires more than 'excusable neglect.'").

For these reasons, if MTC's only proffered reason for missing the deadline was a calendaring error, there is a strong argument this excuse would be insufficient.  However, this is not MTC's only reason—MTC also notes that it did not receive Dr. Iyengar's changes to her deposition testimony until September 12, 2024, and filed its exclusion motion four days later.  The Court concludes that MTC's belated receipt of this information provides good cause for the late filing and further notes that CCLI does not contend it suffered any unfair prejudice from the late filing.  Nor could CCLI make such an argument, given that the original version of the scheduling order contemplated that dispositive motions and expert-exclusion motions would be due on the same day (Doc. 22) and the short delay in MTC's filing has not caused any disruption to the overall case schedule.

D.    **Survey Population**

1.    The Parties' Arguments

As noted, Dr. Iyengar's first specific criticism of Dr. Cunningham is that she "[f]ail[ed] to survey the relevant population of consumers—specifically, surveying an overinclusive universe (churchgoers) with no way to narrow it down to worship leaders or other decisionmakers in the relevant market."  (Doc. 57-31 at 7.)

MTC argues that Dr. Iyengar's opinion that Dr. Cunningham surveyed the "wrong population" is "not predicated on 'sufficient facts or data,' and is manifestly unreliable."  (Doc. 60 at 6-13.)  MTC's first argument in support of this contention is that Dr. Iyengar "admitted having virtually no knowledge regarding the ambit of goods and services offered under the subject Mark."  (*Id.* at 4.)  As one example, MTC cites an exchange during Dr. Iyengar's deposition in which, when asked if she was aware of the "more than 12,000

songs" available for download on MTC's website, she responded that she "[hadn't] looked at their catalog." (*Id.* at 7.) Relatedly, MTC argues that Dr. Iyengar "did nothing to educate herself about the consumers who actually encounter [the Mark]." (*Id.* at 6-7.) MTC emphasizes an exchange during Dr. Iyengar's deposition that purports to demonstrate "abject ignorance of the consumers who are likely to encounter [the Mark] and/or purchase its goods and services." (*Id.* at 9-10 [Q: "[C]an you say that you actually relied upon any source of data . . . to attempt to determine how many individuals in the United States were employed as leaders for churches who might make purchasing decisions for the goods and services offered at Multitracks.com?" A: "I did not personally do that, no."]). MTC also emphasizes other portions of the deposition in which Dr. Iyengar expressed unawareness of MTC's YouTube "users and subscribers." (*Id.* at 10.) MTC also argues that Dr. Iyengar had "no actual data" to support her opinion that "only 'church worship leaders' comprise the relevant consuming public who might encounter the Mark." (*Id.* at 11.) In support of this argument, MTC cites an exchange during Dr. Iyengar's deposition in which she expressed an inability to identify the percentage of "individuals who make purchasing decisions to purchase goods and services at Multitracks.com" who are worship leaders. (*Id.*) MTC further argues that Dr. Iyengar's deposition demonstrated that her opinion is predicated on "the fallacious assumption" that the Mark was used in connection only with "multitrack products." (*Id.* at 8 [Q: "Okay. Did anyone as part of your engagement tell you that the only products offered at Multitracks.com were multitrack products?" A: "Again, I understood this in relation to multitrack products."]). MTC further argues that Dr. Iyengar's failure to review Ross's testimony undermines her opinions, because Ross was a customer of MTC yet is not a church worship leader. (*Id.* at 13.) Last, MTC argues that *Nikolova v. Univ. of Texas at Austin*, 585 F. Supp. 3d 936, 946 (W.D. Tex. 2022), *modified in part,* 2022 WL 22830489 (W.D. Tex. 2022), is "instructive" and compels exclusion of Dr. Iyengar's opinions. (*Id.* at 12.)

In response, CCLI argues that MTC's arguments "conflict[] with MTC's own testimony and public statements," including testimony from Edwards and certain

statements on MTC's website suggesting that "the customer base for its products and services are worship leaders." (*Id.* at 8-9.) CCLI further argues that MTC's criticisms of Dr. Iyengar "for not looking at the entire '12,000' song catalogue" or for not knowing that MTC "offers certain products to facilitate live worship that it chooses to label as something other than 'multitracks' products" are ineffectual because neither criticism "change[s] the fact that worship leaders—not ordinary churchgoers—are the relevant purchasing decisionmakers for such products." (*Id.*) CCLI also contends that, contrary to MTC's claims, "Mr. Ross *is* a church worship leader and a highly accomplished musician and live sound engineer." (*Id.* at 9.) Last, CCLI argues that "MTC's assertion that Dr. Iyengar reviewed only 'selected documents provided to [her] by' counsel is likewise untrue" because "[a]s set forth in Dr. Iyengar's report, she reviewed a wide array of documents and engaged in independent research to form her opinion and '[c]ounsel for CCLI did not refuse to provide any documents [she] requested.'" (*Id.*)

In reply, MTC argues that CCLI's arguments "perpetuate the same fallacies" on which Dr. Iyengar's report is based—namely, that MTC's consumer base is limited to "worship leaders" and that Dr. Cunningham's survey was administered to "ordinary churchgoers." (*Id.* at 2.) With respect to the "worship leader fallacy," MTC argues that it conflicts with Edwards's testimony, in which he refers to MTC's "significant customer base . . . from artists to labels to customers." (*Id.* at 2-3, citing Doc. 65-1 at 48:9-16.) MTC further argues that although, as CCLI indicates, "Edwards did refer to 'worship leaders and churches,' he made clear that the market for goods and services offered by [MTC] under the Mark . . . included 'musicians,' 'music directors,' [and] 'musicians in churches that use Multitracks in live performance.'" (*Id.* at 3.) MTC argues that this testimony is further supported by Edwards's declaration and the testimony of Timothy Whincop ("Whincop"). (*Id.* at 3 n.3.) MTC argues that "[r]ather than concede that Mr. Ross purchased a song from [MTC] because he was just a fan of the band that played it (as he admitted in his deposition), [CCLI] instead tries to shoehorn Mr. Ross into the role of 'worship leader.'" (*Id.* at 5-6.) With respect to the "ordinary churchgoer fallacy," MTC argues that "[CCLI]

1    repeats no fewer than six times the demonstrably false claim that Dr. Cunningham

2    administered her survey to 'ordinary churchgoers.'" (*Id.* at 6.)

3                    2.    Analysis

4            As an initial matter, the Court notes that MTC does not challenge Dr. Iyengar's

5    qualifications. (Doc. 60 at 5 ["Here, it is not that Dr. Iyengar is inherently unqualified to

6    give opinions in this matter."]).  Nor would such a challenge be likely to succeed.  Dr.

7    Iyengar possesses expertise and experience in survey research, design, and analysis,

8    specifically in the trademark context. (Doc. 57-31 at 4-5.)  And "[w]hen evaluating

9    specialized or technical expert opinion testimony, the relevant reliability concerns may

10   focus upon personal knowledge or experience." *United States v. Sandoval-Mendoza*, 472

11   F.3d 645, 655 (9th Cir. 2006).  Furthermore, other courts have allowed Dr. Iyengar to opine

12   on related issues. *In re Folgers Coffee, Mktg. Litig.*, 2024 WL 4093071, *5 (W.D. Mo.

13   2024) ("Ultimately, none of Defendants' arguments establish Dr. Iyengar's opinion 'is so

14   fundamentally unsupported that it can offer no assistance to the jury.'") (cleaned up);

15   *RingCentral, Inc. v. Nextiva, Inc.*, 2021 WL 12171875, *5 (N.D. Cal. 2021) ("None of

16   Nextiva's arguments show that Iyengar's analysis lacks a 'reliable foundation' or

17   'relevan[ce] to the task at hand.'").  Although those decisions are not binding here, they

18   provide a lens through which to analyze the reliability of Dr. Iyengar's opinions.

19           In addition to her qualifications and experience, Dr. Iyengar provides a list of all of

20   the resources on which she relied. (Doc. 57-31 at 42-44.)  Those resources include

21   academic literature, case law, pleadings and other litigation materials, websites (including

22   two MTC web pages), and other documents. (*Id.*)  MTC does not question the legitimacy

23   of those sources.[2]

24           Nevertheless, MTC cites several excerpts from Dr. Iyengar's deposition purporting

25   to demonstrate her "abject ignorance" of MTC's products and services.  These criticisms

26   at most go to the weight of Dr. Iyengar's opinions and fail to establish a lack of foundation

27

28   _____

     [2]        Dr. Cunningham refers to some of the same sources in her own expert and rebuttal
     reports. (Doc. 60-6 at 8-10; Doc. 60-7 at 3, 7, 8.)

or reliability. For example, MTC argues that Dr. Iyengar's acknowledgement that she did not review MTC's full catalog of "more than 12,000 songs" demonstrates that she did "nothing to familiarize herself with the actual products and services offered by Defendant under the Mark." (Doc. 60 at 9.) But MTC does not explain why Dr. Iyengar needed to review each and every song title in its massive catalog to gain an understanding of the nature of its offerings. *Cf.* Fed. R. Evid. 702, advisory committee note to 2023 amendments ("[I]f the court finds it more likely than not that an expert has a sufficient basis to support an opinion, the fact that the expert has not read every single study that exists will raise a question of weight and not admissibility.").

MTC also contends that Dr. Iyengar lacked a sufficient foundation to opine about the nature of its customer base, citing her acknowledgement that she did not rely on "any source of data . . . to attempt to determine how many individuals in the United States were employed as leaders for churches who might make purchasing decisions for the goods and services offered at Multitracks.com," her acknowledgement that she did not review MTC's YouTube channel to learn more about its subscribers, and her inability to quantify the "percentage of individuals who make purchasing decisions to purchase goods and services at Multitracks.com that comprise 'church worship leaders.'" (Doc. 60 at 9-11.) But again, the fact that Dr. Iyengar could have done even more to solidify the foundation for her opinions does not establish that the approach she took was so unreliable or insufficient as to warrant exclusion. This is especially true given the undisputed fact that Dr. Iyengar reviewed MTC's website and the websites of several of its competitors. *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1095 (9th Cir. 2014) (affirming denial of *Daubert* motion, which was premised in part on expert's reliance on internet research when conducting market survey, because movant 'fail[ed] to explain why the Internet is an inappropriate resource for conducting market research' and 'had ample opportunity to cross-examine [the expert] about his underlying sources and discredit them'); *Longoria v. Kodiak Concepts LLC*, 2021 WL 1100373, *15 (D. Ariz. 2021) ("The Court accepts that conducting internet research and extrapolating from it can be a reliable methodology."). At most, the cited exchanges

show certain gaps in Dr. Iyengar's knowledge. But the existence of those gaps does not, at least when considered in light of Dr. Iyengar's experience, qualifications, and the independent research she conducted, render her opinions so unreliable as to be inadmissible. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Dr. Iyengar's role as a *de facto* rebuttal witness only strengthens this conclusion. *Ringcentral, Inc. v. Nextiva, Inc.*, 2021 WL 12171869, *4 (N.D. Cal. 2021) ("RingCentral argues that House's rebuttal report lacks factual foundation because it is not based on any concrete data . . . and . . . is based on mere 'expert[] speculation' because he failed to undertake any investigation of his own in challenging Eichmann. The Court disagrees . . . [because] a rebuttal expert . . . is entitled to rest his rebuttal on [the other expert's] assumptions and is not required to conduct independent alternative opinions or investigations.") (cleaned up); *Cmty. Ass'n for Restoration of the Env't v. Cow Palace, LLC*, 80 F. Supp. 3d 1180, 1215 (E.D. Wash. 2015) ("[Defendant's rebuttal expert] need not develop alternative, affirmative opinions in order to adequately rebut the evidence presented by Plaintiffs—that is not Defendants' burden.").[3]

Meanwhile, Dr. Iyengar's statement that she "understood" that this lawsuit is only "in relation to multitrack products" does not demonstrate that her opinions are based on a "fallacious assumption" regarding the products offered by MTC. The issues of what, exactly, a "multitrack" is and which products can be considered "wholly unrelated" to multitracks are complex, so regardless of whether Dr. Iyengar is ultimately correct in this assumption, her statement does not betray a fundamental ignorance regarding the products and services offered by MTC. *See, e.g.*, *Flying Fish Bikes, Inc. v. Giant Bicycle, Inc.*, 2014 WL 12621218, *1 (M.D. Fla. 2014) (drawing a distinction between "an expert's

---

[3]    Although Dr. Iyengar is technically a "responding" expert, her report is limited to critiquing Dr. Cunningham's survey and so may properly be treated as a rebuttal report. Dr. Cunningham appears to recognize as much. (Doc. 60-7 at 2 ["Iyengar quoted Jay multiple times in her rebuttal . . . ."]).

unquestioned ability to render an opinion based on assumed facts and an opposing party's ability to factually disprove the expert's factual assumptions" and emphasizing that "[t]he prospect that the opposition might disprove assumed facts . . . presents no barrier to the admissibility of an expert's opinion").

Nor does Dr. Iyengar's failure to cite Ross's testimony provide a basis for exclusion. MTC argues that because Ross was a customer of MTC yet is not a worship leader, Dr. Iyengar's opinion that only worship leaders constitute the proper survey universe is demonstrably unreliable. (Doc. 60 at 13.) But again, MTC exaggerates the implications of these facts. First, even assuming Ross is not a worship leader, Dr. Iyengar's failure to consider a single fact that could contradict her opinions would not render her opinions so unreliable as to be inadmissible. *Alaska Rent-A-Car, Inc.,* 738 F.3d at 969 ("Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable."). Second, neither party defines the term "worship leader" and the precise contours of that class, and whether it would include people in Ross's or similar roles, may be a matter of factual dispute as this case proceeds. Consequently, Ross's status as a customer of MTC does not necessarily undermine Dr. Iyengar's opinions at all, much less so fundamentally that it renders the opinions inadmissible.

This leaves one final basis for challenging Dr. Iyengar's opinions—one that, in the Court's view, creates the closest call as to whether exclusion is warranted. In her report, Dr. Iyengar contends that Dr. Cunningham's survey population was "overinclusive" in part because it included mere "churchgoers" who would not be users or buyers of MTC's products. (Doc. 57-31 at 7, 19-23.) The apparent basis for this claim is Dr. Iyengar's interpretation of Dr. Cunningham's description of the survey population. Dr. Iyengar characterizes the survey population as including:

> U.S. adults who have or are likely to attend Christian religious services ***and/or*** "regularly or occasionally participated with his/her church or religious organization in musical performances or rehearsals, or adult or children choir, or worship services, and typically performed contemporary or modern music when doing so."

1    (*Id.* at 19.)

2    This interpretation is demonstrably incorrect.  Dr. Iyengar erroneously uses the

3    hyphenated conjunction "and/or," which suggests the survey population includes those

4    persons who attend church without participating in the musical performances.  But in

5    describing her survey, Dr. Cunningham used the standalone conjunction "and" at the same

6    critical point, thereby indicating that it only included those persons who attend church *and*

7    participate in the musical performances.  (Doc. 60-6 at 10, emphasis added ["[M]y survey

8    included only those individuals who . . . indicated that they had attended . . . or were likely

9    to attend . . . a Christian religious service *and* regularly or occasionally participated with

10    his/her church or religious organization in musical performances or rehearsals, or adult or

11    children choir, or worship services, and typically performed contemporary or modern

12    music when doing so."].)  Dr. Cunningham emphasizes this point in her own rebuttal

13    report.  (Doc. 60-7 at 5 ["Dr. Iyengar is wrong in stating that my universe is overinclusive.

14    I did not simply survey[] 'churchgoers.'  I surveyed Christian churchgoers who

15    'participated . . . in musical performances or rehearsals, or adult or children choir, or

16    worship services, and typically performed contemporary or modern music when doing so.'

17    This universe/sample is a distinct subset of 'churchgoers.'"].)[4]

18    Although this mistake is concerning and will no doubt provide ample fodder from

19    cross-examination, it is not the type of mistake that warrants the wholesale exclusion of

20    Dr. Iyengar's opinions.  *Cf. Cnty. of Maricopa v. Off. Depot Inc.*, 2019 WL 5066808, *22

21    (D. Ariz. 2019) ("Although the Court is troubled by the errors, which Office Depot

22    dramatically illustrated during the hearing, the Court is not convinced they were so

23    pervasive as to render Ratliff's methodology unreliable as a matter of law.").  Again, Dr.

24    Iyengar's overarching position is that Dr. Cunningham used the wrong survey population

25    and should have limited to survey "to worship leaders or other decisionmakers in the

26    relevant market."  (Doc. 57-31 at 7.)  Accordingly, even though Dr. Iyengar was wrong to

27

28    _____

[4]    This fact is further reflected in the survey itself attached as an exhibit to Dr. Cunningham's report.  (Doc. 60-6 at 26-27.)

1    contend that Dr. Cunningham included all churchgoers in the survey, when in fact Dr.

2    Cunningham's population was limited to the subset of churchgoers who also participate in

3    modern musical performances, this population was still too broad in Dr. Iyengar's view

4    because it was not limited to worship leaders or other decisionmakers.

5         E.    **Use Of Dr. Poret's Methodology**[5]

6              1.    The Parties' Arguments

7         MTC argues that Dr. Iyengar's criticisms of Dr. Cunningham's survey ignore "that

8    the United States Supreme Court [in *Booking.com*] accepted and ratified a Teflon survey

9    conducted in precisely the same manner, and using precisely the same comparators." (Doc.

10   60 at 14.) MTC further argues that "Dr. Iyengar offers no cogent rationale for concluding

11   that a Teflon survey that was admittedly accepted as 'reliable' and which used 'exactly the

12   same description' for comparison marks is somehow improper." (*Id.* at 15.) MTC

13   concludes that this "analytical gap" between Dr. Iyengar's opinion and "the data on which

14   her opinion is predicated" should compel exclusion. (*Id.*)

15        In response, CCLI argues that "MTC's claim that the United States Supreme Court

16   has somehow immunized Dr. Cunningham's flawed survey methodology from criticism

17   has no basis in law." (Doc. 62 at 10.) CCLI first contends that "the acceptability of the

18   [Poret] survey was not before the Supreme Court in *Booking.com*." (*Id.*) CCLI next

19   contends that although "[i]t is true that the district court in the *Booking.com* litigation

20   denied a motion to exclude Poret's survey . . . the district court never suggested that the

21   Poret survey was immune to criticism," and furthermore such a ruling would be binding

22   here. (*Id.*, cleaned up.) Last, CCLI contends that Dr. Cunningham's survey suffers from

23   the same flaws that the Trademark Trial and Appeal Board ("TTAB") identified in *In re*

24   *Benjamin & Brothers, LLC*, Serial No. 88396223 (TTAB 2023)—namely, that "(1) only

25

26   _____

     [5]    Although Dr. Iyengar presents two seemingly distinct methodological criticisms—
27   namely, that Dr. Cunningham (1) failed to "present the mark within the proper frame of
     reference"; and (2) failed to "include the appropriate comparison names" (Doc. 57-31 at
28   7)—the parties appear to lump together these two criticisms into a general criticism of Dr.
     Poret's methodology and Dr. Cunningham's use of it. (Doc. 60 at 13-15; Doc. 62 at 14-
     15; Doc. 65 at 7-9.) The Court thus follows the same approach here.

two of the six names used to educate survey participants on the difference between common and brand names were '.com' names, (2) neither term in the mini test used to test participants' understanding of the difference between a common name and brand name was a '.com' name[,] and (3) approximately 40% of respondents incorrectly identified WASHINGMACHINE.COM as a brand name." (*Id.*)  CCLI also contends that "Dr. Cunningham's rote copying of Poret undermines her analysis." (*Id.* at 10-11.)

In reply, MTC criticizes CCLI's reliance on *In re Benjamin*, which is "an unreported case from an administrative tribunal that is not binding on this court" and which nevertheless did not "hold that the 'Poret survey methodology is critically flawed.'" (Doc. 65 at 8.)  MTC argues that "the TTAB actually concluded that the survey at issue in *In re Benjamin* was flawed because the applicant did not demonstrate that it was precisely modeled on the Poret Survey in *Booking.com*" and that "[f]ar from rejecting the soundness of the Poret Survey, the TTAB noted the difference in *results* in the survey it considered compared to the Poret Survey." (*Id.*)

### 2.    Analysis

Dr. Iyengar's criticism of Dr. Cunningham's survey methodology is twofold: (1) the survey adopts Dr. Poret's Teflon methodology, which is itself flawed; and (2) even if the Poret methodology is not itself flawed, Dr. Cunningham's "rote copying" of that methodology was improper because surveys must be carefully tailored to the unique facts of each case.  (Doc. 62 at 10-11.)

With respect to the first criticism, although MTC is correct that the district court in *Booking.com B.V. v. Matal*, 278 F. Supp. 3d 891, 918 (E.D. Va. 2017), accepted Dr. Poret's Teflon survey as reliable, this does not preclude Dr. Iyengar from offering a critique of that methodology here.  *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.") (citation and internal quotation marks omitted); *Starbuck v. City and County of San Francisco*, 556 F.2d 450, 457 n.13 (9th Cir. 1977) ("The doctrine of stare decisis does not compel one district

court judge to follow the decision of another."). Meanwhile, although the Supreme Court's decision in *Booking.com* is, of course, binding here, that decision did not make an admissibility determination or otherwise opine on Dr. Poret's methodology. It merely states that because "the PTO does not contest the lower courts' assessment of [the Poret survey] . . . we have no occasion to reweigh that evidence." *Booking.com*, 591 U.S. at 561 n.6. The Supreme Court's choice not to review one district court's unchallenged finding regarding the admissibility of a survey doesn't preclude further challenges to another survey utilizing the same methods.

Turning to the merits, *In re Benjamin* provides at least some support for Dr. Iyengar's first criticism. There, the TTAB ruled that an applicant's survey, which was modeled on the Poret survey[6] used in *Booking.com*, suffered from certain methodological flaws that undermined (but did not eliminate) its probative value. *In re Benjamin*, Serial No. 88396223 at 36 ("Although the flaws in the [survey] diminish its probative value, it is not devoid of significance."). Although the parties dispute the degree to which *In re Benjamin* supports CCLI's arguments, at the very least, it offers some support for Dr. Iyengar's claim that the Poret methodology is flawed. This is true even though TTAB decisions "are not binding," *Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 506 (9th Cir. 2011), and even though nonprecedential TTAB decisions, like *In re Benjamin*, carry even less weight. *In Re the Procter & Gamble Co.*, 105 U.S.P.Q.2d 1119 (T.T.A.B. 2012) ("an opinion designated as not precedential is not binding upon the Board").

With respect to Dr. Iyengar's second criticism, the Court is confident that it satisfies

---

[6]    MTC at one point seems to question whether the survey in *In re Benjamin* was in fact based on Dr. Poret's methodology—and, thus, whether the decision supports the proposition that Dr. Cunningham's survey methodology has flaws. (Doc. 65 at 8.) True, the TTAB in that case appeared to express some uncertainty on this issue, noting that "Applicant, however, did not introduce a copy of the Poret Survey used in *Booking.com* for comparison." (Doc. 65-3 at 28. *See also id.* at 24 ["Dr. Peterson *purportedly* modeled Applicant's survey methodology on the survey conducted by Hal Poret."].) But here, the parties agree that Dr. Cunningham's survey was modeled after Dr. Poret's survey, and Dr. Cunningham survey bears remarkable resemblance to the survey in *In re Benjamin*. (Doc. 57-31 at 33 [Dr. Cunningham's survey and Dr. Poret's survey each used the comparison names ETRADE.COM, PEPSI, SHUTTERFLY, SPORTING GOODS, WASHINGMACHINE.COM. and SUPERMARKET]; Doc. 65-3 at 25-26 [noting that the survey in *In re Benjamin* included the same comparison names].)

the admissibility requirements of Rule 702.  In her report, Dr. Iyengar opines that "[r]ather than tailoring her comparison words to those related to the products and services of the parties in this case, Dr. Cunningham appears to have taken the comparison names and descriptions directly from [Dr.] Poret's Teflon survey in *Booking.com*."  (Doc. 57-31 at 32-33.)  In support of this criticism, Dr. Iyengar cites a scholarly treatise.  (*Id.* ["As Jay notes, 'most Teflon Surveys have evolved such that they provide examples of brand and common names and include comparison names that concern the same product genus as the challenged mark (or ones that are similar to the challenged mark).'"]).  MTC makes no effort to explain why it was unreliable for Dr. Iyengar to raise a line of criticism that has gained acceptance in the relevant field, and the Court concludes, at any rate, that such a criticism is cogent, reasonable, and does not present the sort of "analytical gap" that would require exclusion.

III.    <u>Cross-Motions For Summary Judgment</u>

       A.    **Legal Standard**

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).  The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor."  *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts."  *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

1    *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  *See*

2    *also Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

3          There is no issue for trial unless enough evidence favors the non-moving party.

4    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "If the evidence is merely

5    colorable or is not significantly probative, summary judgment may be granted."  *Id.* at 249-

6    50 (citations omitted).  At the same time, the evidence of the non-movant is "to be believed,

7    and all justifiable inferences are to be drawn in [its] favor."  *Id.* at 255.  "[I]n ruling on a

8    motion for summary judgment, the judge must view the evidence presented through the

9    prism of the substantive evidentiary burden."  *Id.* at 254.  Thus, "the trial judge's summary

10   judgment inquiry as to whether a genuine issue exists will be whether the evidence

11   presented is such that a jury applying that evidentiary standard could reasonably find for

12   either the plaintiff or the defendant."  *Id.* at 255.

13         "[W]hen parties submit cross-motions for summary judgment, [e]ach motion must

14   be considered on its own merits," but the Court must consider all evidence submitted in

15   support of both cross-motions when separately reviewing the merits of each motion.  *Fair*

16   *Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir.

17   2001) (internal quotation marks omitted).  For "the party with the burden of persuasion at

18   trial" to succeed in obtaining summary judgment, it "must establish beyond controversy

19   every essential element" of each claim on which summary judgment is sought.  *S. Cal. Gas*

20   *Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (internal quotation marks

21   omitted).  The party without the burden of persuasion at trial is entitled to summary

22   judgment where it establishes that the party with the burden of persuasion will be unable

23   to prove at least one element of its claim in light of the undisputed facts.  *Celotex Corp.*,

24   477 U.S. at 322-23.  This distinction reflects that the burden is ultimately on the proponent

25   of each claim to prove it.  *Id.* ("Rule 56(c) mandates the entry of summary judgment, after

26   adequate time for discovery and upon motion, against a party who fails to make a showing

27   sufficient to establish the existence of an element essential to that party's case, and on

28   which that party will bear the burden of proof at trial.  In such a situation, there can be 'no

1   genuine issue as to any material fact,' since a complete failure of proof concerning an

2   essential element of the nonmoving party's case necessarily renders all other facts

3   immaterial.").

4       **B.    The ACPA**

5       The parties' dispute turns on whether CCLI, by using the domain name

6   multitrack.com to redirect traffic to the website of a related company that was one of

7   MTC's competitors, engaged in cybersquatting in violation of the ACPA.  CCLI seeks a

8   declaratory judgment that it did not engage in cybersquatting.  (Doc. 1.)  MTC seeks

9   damages for CCLI's alleged cybersquatting violation.  (Doc. 11.)

10      "The [ACPA] establishes civil liability . . . where a plaintiff proves that (1) the

11  defendant registered, trafficked in, or used a domain name; (2) the domain name is identical

12  or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant

13  acted 'with bad faith intent to profit from that mark.'"  *DSPT Int'l, Inc. v. Nahum*, 624 F.3d

14  1213, 1218-19 (9th Cir. 2010).  Here, the parties' summary judgment briefing implicates

15  only the second and third elements—the parties dispute whether the Mark (*i.e.,*

16  MULTITRACKS.COM)[7] is a "protected mark" and whether CCLI acted in bad faith when

17  using the domain name multitrack.com.

18      **C.    "Protected Mark"**

19      "The threshold issue in any action for trademark infringement is whether the words

20  used by a [plaintiff] in connection with his product are entitled to protection."  *Transgo,*

21  *Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1014 (9th Cir. 1985).  The Ninth

---

22  [7]      In the complaint, CCLI alleges that MTC "claim[s] to have trademark rights in three

23  purported marks: MULTITRACKS CLOUD, MULTITRACKS STREAMING, and
    MULTITRACKS.COM" and that "MTC has not established that it has rights in any of the

24  Purported Marks."  (Doc. 1 ¶¶ 34, 54.)  Initially, MTC seemed to take the position that it
    does, in fact, possess protectable rights in all three marks. (Doc. 11 at 5 ¶ 34.) Accordingly,

25  CCLI moved for summary judgment as to all three marks.  (Doc. 57 at 7 ["Each of the
    Purported Marks is generic or, at best, merely descriptive of multitrack or multitracks

26  products."].)  In response, MTC made no effort to show that MULTITRACKS CLOUD or
    MULTITRACKS STREAMING are protected marks, as it was required to do under

27  *Celotex*.  The Court thus agrees with CCLI's assertion in its reply that "CCLI's motion
    must be granted as to those two purported marks."  (Doc. 71 at 1-2.)  It is for this reason

28  that CCLI's motion is being granted in part and denied in part, rather than being denied in
    full.

- 26 -

Circuit has "identif[ied] four categories of terms with respect to trademark protection: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Surgicenters of Am., Inc. v. Medical Dental Surgeries, Co.*, 601 F.2d 1011, 1014 (9th Cir. 1979). These categories may be summarized as follows:

> A "generic" term is one that refers, or has come to be understood as referring, to the genus of which the particular product or service is a species. It cannot become a trademark under any circumstances. A merely "descriptive" term specifically describes a characteristic or ingredient of an article or service. It can, by acquiring a secondary meaning, *i.e.*, becoming "distinctive of the applicant's goods", become a valid trademark. A "suggestive" term suggests rather than describes an ingredient, quality, or characteristic of the goods and requires imagination, thought, and perception to determine the nature of the goods. A suggestive term is entitled to registration without proof of secondary meaning. An "arbitrary or fanciful" term is usually applied to words invented solely for their use as trademarks and enjoys all the rights accorded to suggestive terms without the need of debating whether the term is "merely descriptive" and with ease of establishing infringement.

*Id.* at 1014-15 (citations omitted).

Only the first two categories are at issue here. In its summary judgment motion, CCLI argues the Mark is not protected because (1) it "is generic"; or alternatively (2) it is "at best, merely descriptive" and has not "acquired secondary meaning." (Doc. 57 at 7-8.) Meanwhile, in its cross-motion, MTC "requests that the Court enter summary judgment on Plaintiff's claims that [the Mark] is generic or merely descriptive . . . ." (Doc. 61 at 1.)

### 1. Generic

"Generic terms are those that refer to the genus of which the particular product or service is a species, *i.e.*, the name of the product or service itself." *Advertise.com, Inc. v. AOL Advert., Inc.*, 616 F.3d 974, 977 (9th Cir. 2010) (internal quotation marks omitted). As noted, a generic term "cannot become a trademark under any circumstances." *Filipino Yellow Pages, Inc. v. Asian J. Publications, Inc.*, 198 F.3d 1143, 1147 (9th Cir. 1999). For generic terms that have been combined with a top-level domain such as ".com"—what courts call "generic.com" terms—genericness "turns on whether that term, taken as a whole, signifies to consumers" the relevant class of products and/or services offered.

1   *Booking.com*, 591 U.S. at 557.  "Evidence informing that inquiry can include not only

2   consumer surveys, but also dictionaries, usage by consumers and competitors, and any

3   other source of evidence bearing on how consumers perceive a term's meaning."  *Id.* at

4   561 n.6.

5                    a.    **The Parties' Arguments**

6           Although CCLI clarifies in a footnote in its motion that it is not seeking an

7   affirmative grant of summary judgment on the issue of genericness—"CCLI contests that

8   [the Mark] is anything more than a generic term . . . but has chosen not to raise this issue

9   on summary judgment" (Doc. 57 at 8 n.3)—CCLI nevertheless argues in its motion that

10  the Mark is generic because "multitracks" is a common music industry term for a class of

11  products.  (*Id.* at 2-3.)  In support of this contention, CCLI cites an array of sources,

12  including a dictionary entry and a prior version of MTC's website.  *Id.*

13          In response—and in its separate cross-motion—MTC identifies several reasons why

14  the Mark should be deemed not generic.  (Doc. 61 at 11-13; Doc. 69 at 5-7.)  For example,

15  MTC argues that although it does not have a federally registered trademark, the PTO's

16  determination that the Mark is "entitled to registration on the Principal Register" and the

17  PTO's publication of the Mark for opposition[8] both indicate that the Mark is not generic.

18  (Doc. 69 at 5.)  MTC also argues that, under *Booking.com*, generic terms combined with

19  generic domain names like ".com" must be viewed "as a whole" for purposes of trademark

20  analysis (Doc. 69 at 5-6), and that when the Mark is viewed "as a whole," it is not generic

21  because "[t]here is no 'class' or 'genus' of good known as a 'multitrack.com.'"  (Doc. 61

22

23  _____

24  [8]        After a trademark applicant's mark is approved for publication, it is published on
    the Trademark Official Gazette for 30 days, during which time "any member of the public
25  who thinks they'll be harmed by the registration of [the purported] trademark may oppose
    it" by "fil[ing] a Notice of Opposition, which starts a legal proceeding with the [TTAB].
26  If no one opposes [the purported trademark] during the publication period, [the] application
    proceeds to the next stage of the registration process.  It still hasn't registered.  It can take
27  three to four months from the time [the purported trademark] publishes to when [the
    applicant] receive[s] official notification that [the purported trademark] has either
28  registered or moved to the next stage."  Approval for Publication, United States Patent and
    Trademark  Office,  https://www.uspto.gov/trademarks/basics/approval-publication  (last
    visited May 19, 2025).

at 12.)[9] MTC also argues that Edwards's testimony "amply demonstrates [that] the variety of goods and services offered under the Mark exceeds the bounds of a single class or genus." (Doc. 61 at 12.)  MTC thus contends that "as a matter of definition, the Mark cannot be deemed generic as a matter of law." (Doc. 61 at 12.)  Finally, MTC also argues that the results of Dr. Cunningham's survey establish that the Mark is not generic.  (*Id.* at 12-13.)

In reply—and in its separate cross-response—CCLI argues that the "mere publication—rather than registration" of the Mark does not prove a lack of genericness. (Doc. 71 at 2 n.2.)  CCLI also contends that, under *Advertise.com*, it is "certainly highly unlikely" that a party can demonstrate that a generic.com term is valid and protectable. (Doc. 68 at 4.)  CCLI contends the Mark is generic because "multitracks" form a "genus" that includes not only actual "multitracks" but also all goods and services "directed to or focused on that class of goods."  (*Id.* at 5-7.)  CCLI further argues that a mark is generic if it "is the generic name of any of the goods or services for which registration is sought," and thus the Mark is generic because MTC operates under the name of "multitracks.com" and sells multitracks.  (*Id.* at 6-7, cleaned up.)  Last, CCLI argues that Dr. Cunningham's survey is "so critically flawed as to have no probative value" on the issue of genericness. (*Id.* at 7-8.)

In its cross-reply, MTC argues that CCLI "ignores the most fundamental argument raised by [MTC]"—namely, that there is no "genus" of goods or services known as "multitracks.com," which, rather than merely "multitracks," is the composite trademark at issue.  (Doc. 70 at 1-2.)  MTC also argues that CCLI's attempts to discredit Dr. Cunningham are "fallow and ineffectual" because CCLI never deposed or challenged Dr. Cunningham.  (*Id.* at 4-5.)  MTC further argues that CCLI relies on outdated cases, such as *Advertise.com*, that predate *Booking.com* and its "anti-dissection rule"[10] and that CCLI's

---

[9]    MTC likely meant "a mulitracks.com," as evidenced by its arguments elsewhere in its briefs.  (Doc. 61 at 1.)

[10]    By "anti-dissection rule," MTC refers to *Booking.com*'s statement that marks must be considered "as a whole."

1    cited cases do not, at any rate, show that the Mark is generic.  (*Id.* at 5-6.)  Next, MTC

2    argues that it has provided unrebutted evidence that the Mark is not generic in the form of

3    Edwards's testimony, which shows that MTC offers many products and services beyond

4    anything that could be called "multitracks," and that CCLI offers no rebuttal beyond the

5    "glib *ipse dixit*" that this testimony was "incorrect."  (*Id.* at 6-8.)  Last, MTC argues that

6    CCLI cannot establish that "multitracks" constitute a genus of goods or services because

7    the Ninth Circuit has held that courts "must construe the particular genus of goods or

8    services considering consumer perception" and all of the consumer evidence here—which

9    includes the testimony of Ross, Whincop, and Jorge Olide ("Olide"), as well as Dr.

10    Cunningham's survey—establishes that the Mark operates as a "source designator" rather

11    than as a term referring to a defined "genus."  (*Id.* at 2-4, 9.)

12                  b.    **Analysis**

13          Because MTC seeks trademark protection for a mark that  has not yet been federally

14    registered (Doc. 11 ¶ 35),[11] it bears the burden of proving the Mark is nongeneric.  *Filipino*

15    *Yellow Pages, Inc.*, 198 F.3d at 1146.

16          MTC's "most fundamental argument" is that the Mark cannot, by definition, be

17    generic because "there is no genus of products known as "multitracks.com."  MTC's

18    argument appears to be that "multitracks.com" (*i.e.*, the whole mark)[12] cannot identify any

19    genus because a "multitracks.com" is not the name of any discrete product or service.

20

21    ———————
[11]    Although MTC argues that the PTO's decision to publish the Mark in the Trademark

22    Official Gazette for opposition constitutes evidence the Mark is not generic, MTC offers no authority for this proposition and the relevant case law is the contrary.  *Provident*

23    *Precious Metals, LLC v. Nw. Territorial Mint, LLC*, 117 F. Supp. 3d 879, 891 (N.D. Tex. 2015) ("NWTM is not entitled to any presumption that the SBB and CBB marks are not

24    descriptive merely because they were published for opposition."); *Lyons v. Am. Coll. of Veterinary Sports Med. & Rehab., Inc.*, 997 F. Supp. 2d 92, 102 (D. Mass. 2014) (where "the PTO has not issued a certificate of registration on the principal register," "Lyons

25    cannot rely on the statutory presumption of distinctiveness afforded to marks on the principal register despite her many attempts to do so").

26    [12]    MTC also appears to argue that the standalone term "multitrack" or "multitracks" is not generic.  (Doc. 69 at 4 n.5 ["Similarly, the use of the word 'multi-track' as a noun is a

27    recent development—Defendant's competitors and consumers alike generally refer to these specific products as stems, loops, accompaniment tracks, or backing tracks."]).

28    Because the relevant term in the genericness inquiry is the Mark considered as a whole, it is unnecessary to reach this issue.

1      This argument is foreclosed by *Booking.com*.  There, the Supreme Court held that a

2 "generic.com" term may be denied trademark protection if that term, "taken as a whole,

3 signifies to consumers [a] class" of products or services.  *Booking.com*, 591 U.S. at 557.

4 The Court added: "*[W]e do not embrace a rule automatically classifying such terms as*

5 *nongeneric*.  Whether any given 'generic.com' term is generic, we hold, depends on

6 whether *consumers in fact* perceive that term as the name of a class or, instead, as a term

7 capable of distinguishing among members of the class."  *Id.* at 560-61 (emphases added).

8      True, *Booking.com* also includes language suggesting that the addition of a top-level

9 domain name like ".com" to an otherwise generic term renders that term more distinctive

10 (and therefore less likely to be generic) than the standalone term.  For instance, the Court

11 explained that a "generic.com" mark conveys not only "that the generic good or service is

12 offered online" but also a "source-identifying characteristic: an association with a

13 particular website." *Id.* at 559.  Elaborating on this point, the Court explained that "only

14 one entity can occupy a particular Internet domain name at a time, so a consumer who is

15 familiar with that aspect of the domain-name system can infer that BOOKING.COM refers

16 to *some* specific entity." *Id.* (cleaned up).  Elsewhere, the Court stated that "if

17 'Booking.com' were generic, we might expect consumers to understand Travelocity—

18 another such service—to be a 'Booking.com.'  We might similarly expect that a consumer,

19 searching for a trusted source of online hotel-reservation services, could ask a frequent

20 traveler to name her favorite 'Booking.com' provider." *Id.* at 557.

21      Such language suggests it is quite difficult to demonstrate that a "generic.com" mark

22 is generic—and, consequently, easier for a party seeking trademark protection for such a

23 mark (here, MTC) to prove the mark is nongeneric.  But even so, *Booking.com* holds that

24 whether a "generic.com" mark is generic ultimately turns on how consumers in fact

25 perceive it.  *Booking.com* also rejects the notion—which MTC seems to advocate here—

26 that the inclusion of a top-level domain like ".com" at the end of a purported mark

27 automatically results in a finding of non-genericness.

28      Alternatively, MTC seeks to meet its burden by proffering various pieces of

consumer-perception evidence—which, as noted, is the sort of evidence that *Booking.com* requires.  Most notably, MTC proffers Dr. Cunningham's report, which concludes (based on the results of her Teflon-style survey) that the Mark is not generic.  (Doc. 57-30 at 17 ["The survey . . . shows clearly that the 'MULTITRACKS.COM' was seen as indicative of a brand name and not as indicative of a common name (a generic term)."].)  Additionally, MTC proffers the statements of Ross, Whincop, and Olide.

Before addressing the sufficiency of this evidence, it is necessary to take note of the relevant summary judgment standard.  When, as here, "the moving party bears the burden of proof at trial, different considerations apply.  The moving party . . . 'must lay out the elements of the claim, cite the facts which it believes satisf[y] these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim.'" *Cabral v. State Farm Fire & Casualty Co.*, 582 F. Supp. 3d 701, 707 (D. Ariz. 2022) (quoting *Hotel 71 Mezz Lender LLC v. Nat. Retirement Fund*, 778 F.3d 593, 601 (7th Cir. 2015)).  Additionally, when evaluating the sufficiency of the movant's proffered evidence, courts must be cognizant of not "crossing into improper credibility determinations." *Id.* at 708.  "Fortunately, there are a few guideposts," including that "if the testimony of a witness is necessary to carry the movant's burden of proof, we look carefully at whether the witness is unbiased and competent, and whether his testimony is positive, internally consistent, unequivocal, and in full accord with the documentary exhibits. . . .  [S]ummary judgment is improper when specific facts are alleged that if proven would call the credibility of the moving party's witness into doubt, especially when the challenged testimony is an essential element of the plaintiff's case.  Indeed, if the credibility of a critical interested witness is even partially undermined in a material way by the non-moving party's evidence, summary judgment in favor of the party with the burden of proof should be denied." *Id.* at 708-09 (quoting *Nationwide Prop. & Cas. Ins. Co. v. Faircloth*, 845 F.3d 378, 382 (8th Cir. 2016)).  *See generally* 2 Gensler, Federal Rules of Evidence, Rules and Procedure, Rule 56 (2022) ("The summary-judgment process is different when the moving party has the burden of proof on an issue. . . .  Obviously, a

party with the burden of proof cannot meet that burden merely by contesting the sufficiency of the other side's proof. Rather, a party with the burden of proof must affirmatively put forth evidence that would satisfy its burden of proof at trial. If the moving party fails to identify and document facts that would support a finding for that party at trial, then the moving must fail."); *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir.1991) ("It is important to remember the non-moving party must produce its significant, probative evidence only after the movant has satisfied its burden of demonstrating there is no genuine dispute on any material fact.") (cited with approval in *Houghton v. Scott*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

With these principles in mind, and recognizing MTC is moving for summary judgment on an issue as to which it will bear the burden of proof at trial, the Court concludes that MTC's proffered consumer-perception evidence is insufficient to compel the entry of summary judgment in MTC's favor on the issue of genericness. Starting with Dr. Cunningham, although a factfinder at trial might very well deem her to be a credible witness and accept the results of her survey, she is the antithesis of an unbiased witness— she is MTC's paid expert. Additionally, CCLI has retained its own expert, Dr. Iyengar, who has now survived a *Daubert* challenge and identified various perceived flaws in Dr. Cunningham's methodology and conclusions (including that Dr. Cunningham used the wrong sample). Under these circumstances, Dr. Cunningham's report is not the sort of evidence that would be sufficient to support a grant of summary judgment in MTC's favor on an issue as to which MTC bears the burden of proof. *Nationwide Prop. & Cas. Ins. Co.*, 845 F.3d at 382 ("[I]f the credibility of a critical interested witness is even partially undermined in a material way by the non-moving party's evidence, summary judgment in favor of the party with the burden of proof should be denied.").

Next, MTC argues that the following exchanges from Ross's deposition constitute an admission that the Mark operates as a "source designator" (Doc. 69 at 5)—*i.e.*, that the Mark communicates to consumers the identity of the producer rather than merely the product—and thus cannot be generic:

Q:     Looking at Exhibit 17, when you redeemed the song Savior's Love from MultiTracks.com, you knew to go to the website www.MultiTracks.com as the source for that song.  Correct?

A:     Yes.

. . . .

Q:     Okay.  If someone wanted to acquire the product Playback, one of the goods offered by my client, is the reader of the portion of Exhibit 23 that we're looking at informed of the source of origin for that particular good?

A:     Yes, it is.

Q:     And the source of origin is MultiTracks.com.  Correct?

A:     Yes.

(Doc. 61-6 at 6, 12.)

The Court disagrees that these passages are sufficient to meet MTC's burden as the summary judgment movant.  First, and most important, *Booking.com* holds that "[w]hether any given 'generic.com' term is generic . . . depends on whether *consumers in fact* perceive that term as the name of a class or, instead, as a term capable of distinguishing among members of the class."  591 U.S. at 560-61 (emphasis added).  Thus, even if an individual consumer like Ross—or even three individuals like Ross, Whincop, and Olide—perceived the Mark to be a source designator, it is difficult to see how these isolated data points could be deemed to constitute consumer-perception evidence that is "so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim."  *Hotel 71 Mezz Lender LLC*, 778 F.3d at 601.  Indeed, that is why survey evidence, rather than anecdotes involving individual consumers, is often used to prove (or disprove) genericness in trademark actions.  *See, e.g., Booking.com*, 591 U.S. at 561 n.6 ("Surveys can be helpful evidence of consumer perception . . . ."); *id.* at 573 (Sotomayor, J., dissenting) ("Under the majority's approach, a 'generic.com' mark's eligibility for trademark protection turns primarily on survey data."); *Orgain, Inc. v. N. Innovations Holding Corp.*, 2021 WL 1321653, *8 (C.D. Cal. 2021) ("The Teflon survey . . . has since become a widely accepted and persuasive way to

present evidence of genericness or lack thereof."); *BellSouth Corp. v. DataNational Corp.*, 60 F.3d 1565, 1570 (Fed. Cir. 1995) (noting that "consumer surveys [are] a preferred method of proving genericness").  Additionally, although MTC appears to view Ross's statements as particularly noteworthy because he "is none other than Plaintiff's former CEO" (Doc. 61 at 9), MTC cites no authority—and the Court is aware of none—holding that Ross's former affiliation with CCLI has any bearing on the consumer-perception calculus or somehow means that his statements function as binding judicial admissions against CCLI on the issue of consumer perception in this action.

Second, at any rate, the Court agrees with CCLI that Ross's statements are ambiguous and could be interpreted by a reasonable factfinder as merely acknowledging that "MTC's website, multitracks.com, was the 'source of origin' for a particular song and Playback software" that he purchased.  (Doc. 68 at 11.)  This ambiguity provides an additional reason why Ross's testimony is insufficient to meet MTC's initial burden.

Turning to Whincop and Olide, both are executives in the worship music industry who have used MTC's services for roughly a decade.  (Doc. 61-4 ¶¶ 1, 4; Doc. 61-5 ¶¶ 1, 4.)  Each avers that "[r]ecord labels and artists all recognize that the MULITITRACKS.COM trademark is associated with Multitracks, LLC and represents the premium platform for worship music resources."  (Doc. 61-4 ¶ 7; Doc. 61-5 ¶ 7.)  MTC contends these declarations establish that consumers perceive the Mark as a signifier of "who" MTC is, rather than merely the class of products and services it sells.  (Doc. 70 at 9.)  CCLI responds that Whincop and Olide "are executives of record labels who supplied sound recordings to MTC—not customers who purchase and use MTC's products" and that their declarations thus "lack probative value."  (Doc. 71 at 4-5.)

The Whincop and Olide declarations are insufficient to meet MTC's initial burden as the summary judgment movant.  The record establishes—and, at a minimum, a juror could conclude when all reasonable inferences are resolved in CCLI's favor—that Whincop and Olide use MTC's services more like self-interested wholesalers than traditional consumers.  (Doc. 61-4 ¶ 5 [declaring that MTC's services, "which include

disbursement of the Company's Christian worship music to churches in numerous countries, including throughout the United States and Latin America, are a valuable service"]; Doc. 61-5 ¶ 5 [same].)    Under Ninth Circuit law, the declarations of self-interested wholesalers provide "very little probative value" regarding consumer perception of a mark. *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 910 (9th Cir. 1995) ("The only evidence SRF offers are declarations by its employees and wholesalers that they think of SRF when they hear the term 'Self-realization.'    However, we agree with the district court that these declarations had 'little probative value regarding the assessment of consumer perception' because they were from SRF's employees and wholesalers.    Trademark law is skeptical of the ability of an associate of a trademark holder to transcend personal biases to give an impartial account of the value of the holder's mark.    Attestations from person in close association and intimate contact with (the trademark claimant's) business do not reflect the views of the purchasing public.'").    The Court also questions whether, as an evidentiary matter, Whincop and Olide may testify about the mental perceptions of MTC held by unspecified "[r]ecord labels and artists."    *Cf. Moore v. Weinstein Co., LLC*, 2012 WL 1884758, *15 (M.D. Tenn. 2012) ("[M]any statements in the declaration impermissibly reflect Joyce Moore's speculation regarding the actions, thoughts, and/or motivations of third parties.").

Finally, to the extent MTC argues that the declaration of Edwards, its own founder and CEO (Doc. 61-1 at 1 ¶ 1), qualifies as conclusive and "unrebutted" evidence that MTC offers various goods and services that cannot accurately described as a "multi-track" (Doc. 61 at 14; Doc. 70 at 6-8), this argument fails to establish an entitlement to summary judgment on the issue of genericness for two reasons.    First, as noted, *Booking.com* holds that the genericness inquiry ultimately "depends on whether *consumers in fact* perceive that [generic.com] term as the name of a class."    591 U.S. at 560-61.    Because Edwards's declaration does not purport to measure or assess consumer perception, it is not the sort of evidence that could meet MTC's significant evidentiary burden as the party seeking summary judgment on an issue as to which it bears the burden of proof.    Second, at any

1    rate, Edwards is hardly a disinterested witness and CCLI has identified various reasons to

2    question the statements in his declaration, including that he "previously . . . swore, under

3    oath, that 'Multitracks.com is the industry leader of digital backing track services and

4    *related* goods and services and it provides these services under the trademark

5    MULTITRACKS.COM.'"  (Doc. 68 at 3, citing Doc. 57-36 ¶ 3.)  As noted above with

6    respect to Dr. Cunningham, "if the credibility of a critical interested witness is even

7    partially undermined in a material way by the non-moving party's evidence, summary

8    judgment in favor of the party with the burden of proof should be denied."  *Nationwide*

9    *Prop. & Cas. Ins. Co.*, 845 F.3d at 382.

10       D.    **Descriptive**

11           1.    The Parties' Arguments

12       CCLI seeks summary judgment on the issue of whether MTC has any "protectable"

13   "trademark rights" in the Mark.  (Doc. 57 at 7.)  CCLI argues the Mark is unprotected

14   because it is "merely descriptive of multitrack or multitracks products" and has not

15   "acquired secondary meaning."  (*Id.* at 7-8.)  In support of the contention that the Mark is

16   merely descriptive, CCLI cites several websites that contain the word "multitrack" in the

17   title, such as hymnmultitracks.com and multitracksforworship.com.  (*Id.* at 2-3.)

18       In response—and in its cross-motion for summary judgment—MTC appears to

19   argue that, as with genericness, CCLI improperly "focuse[s] on one element of [MTC's]

20   composite mark" in its effort to show that the Mark is descriptive.  (Doc. 61 at 13.  *See also*

21   Doc. 69 at 5-6.)  MTC also argues that Ross's testimony demonstrates that the Mark is not

22   merely descriptive for the same reasons outlined in relation to genericness.  (Doc. 69 at 5-

23   6; Doc. 61 at 14-15.)  MTC further argues that the Mark is not "merely descriptive" because

24   "[MTC] offers goods and services under the Mark that have nothing to do with anything

25   that can be described as a 'multi-track,' including 'a panoply of goods and services under

26   the Mark—ranging from software, to licensing, to content—for which the word 'multi-

27   track' does not 'describe' a quality, characteristic, or ingredient."  (Doc. 69 at 6.  *See also*

28   Doc. 61 at 13-14.)

In reply—and in its cross-response—CCLI argues that Ross's testimony does not demonstrate that the Mark operates as a source designator for the same reasons discussed above with regard to genericness. (Doc. 71 at 2.) CCLI also argues that "[c]ontrary to MTC's claim that it offers 'goods and services' that have 'nothing to do' with multitracks, Mr. Edwards previously testified that 'Multitracks.com is the industry leader of digital backing track services and *related goods and services* and it provides these services under the trademark MULTITRACKS.COM.'" (*Id.*, citing Doc. 67-36 ¶ 3. *See also* Doc. 68 at 8-9.) CCLI further contends that MTC misstates the definition of "descriptive," which is not limited to a word or phrase that "subsume[s] a quality, characteristic, or ingredient" of a product but also includes any word that indicates "the intended purpose, function or use of the goods, the size of the goods, the class of users of the goods, a desirable characteristic of the goods, the nature of the goods, or the end effect upon the user." (Doc. 68 at 9-10.) Using this definition, CCLI argues that "the intended purpose and function of [MTC's] goods and services is related to assisting with or enhancing the use of multitracks in live worship performance." (*Id.* at 11.)

In cross-reply, MTC reiterates its definition for descriptiveness and emphasizes that CCLI "fails to rebut the overwhelming evidence that the Mark does not 'convey an immediate idea of the ingredients, qualities, or characteristics of' the 20,000+ songs, array of technological products that allow musicians to rehearse, produce, and perform more efficiently, create custom charts for songs, engage in dynamic performances with the use of presentation aids and lyric projections, license unique 'sounds' such as ambient pads, Kemper Profiles, drum samples, and sound beds, or the host of training, technical, and support services offered by [MTC] under the Mark." (Doc. 70 at 10.)

## 2. Analysis

As noted, there are four categories of terms with respect to trademark protection. *Surgicenters of Am., Inc.*, 601 F.2d at 1014. The second category, "descriptive," is at issue here: "A merely 'descriptive' term specifically describes a characteristic or ingredient of an article or service." *Id.* A mark is also descriptive if it describes "the intended purpose,

function or use of the goods." 1 McCarthy on Trademarks and Unfair Competition § 11:16 (5th ed.). *See also Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, 2008 WL 1913163, *3 (C.D. Cal. 2008), *aff'd*, 327 F. App'x 723 (9th Cir. 2009) ("A descriptive term . . . describes a 'particular quality, *function*, or characteristic of a product or service.'") (emphasis added). Merely descriptive terms are generally not entitled to trademark protection. 15 U.S.C. § 1052(e). Instead, to obtain protection, "descriptive terms must achieve significance in the minds of the public as identifying the applicant's goods or services—a quality called acquired distinctiveness or secondary meaning." *Booking.com*, 591 U.S. at 553-54. *See also Lahoti*, 586 F.3d at 1197 ("Deciding whether a mark is distinctive or merely descriptive is far from an exact science and is a tricky business at best.") (cleaned up).

Courts have not hesitated to characterize "generic.com" marks as descriptive. For example, the district court in *Booking.com* concluded that "Booking.com" was descriptive. 278 F. Supp. 3d at 918. The PTO didn't appeal this determination and the Supreme Court didn't disturb it. *Booking.com*, 591 U.S. at 555. *See also Tranik Enterprises, Inc. v. Fulda*, 2017 WL 11150925, *4 (C.D. Cal. 2017) ("Taken together, 'AuthenticWatches.com' is a descriptive mark and may be entitled to protection."); *In re Steelbuilding.com*, 415 F.3d 1293, 1299-1300 (Fed. Cir. 2005) (concluding that "STEELBUILDING.COM" was a descriptive mark because "steel buildings" were a "significant feature of applicant's services").

Here, the record clearly establishes that MTC sells multitrack products. (Doc. 61-1 ¶ 4 [Edwards: "[M]y company does offer tracks as a discrete product . . . ."]; Doc. 57-38 at 4 [Edwards referring to "[t]he MultiTracks that you download from our website"]). It follows that the Mark—"Multitracks.com"—"describes a characteristic or ingredient" of at least some of the goods and services offered by MTC. *Surgicenters of Am., Inc.*, 601 F.2d at 1014. In fact, there is evidence that "multitracks" comprise a significant portion of MTC's sales. For example, MTC, describing itself on its website, stated that "MultiTracks.com was founded to resource worship leaders on the concept of running

loops, clicks, and multitracks in live worship." (Doc. 62-3 at 3. *See also* Doc. 57-38 at 3 [Edwards's claim that "MultiTracks.com hosts the largest online selection of Original Master MultiTracks for many of today's popular songs and hymns for the Church"]; Doc. 57-38 at 10 ["Since launching in 2006, [MTC] was the first company to introduce the download of multitracks created from original master recordings . . . ."].) These assertions suggest that a key portion of MTC's business is the sale of multitrack products and multitrack services.

Consequently, a reasonable viewer of the Mark could see it as "conveying an immediate impression" of a product MTC provides—namely, that the "tracks" MTC indisputably offers are designed in a certain way suited to the performance of live worship music. In other words, they are "multitracks." This common-sense conceptualization is further supported by the record. For example, CCLI identifies a litany of websites employing some variant of the term "multitrack" or "multitracks" in their domain names. (Doc. 57 at 3, citing Docs. 57-11 through 57-19 [hymnmultitracks.com, multitracksforworship.com, flymultitracks.com, vocalmultitrack.com, multitracksapp.com, multitrackmaster.com, gospelmultitracks.com, vocalmultitrack.com, multitracksmusic.com, multitrackstudio.com, and multitracksapp.com]). It appears that many if not all these websites offer downloadable multitrack products and services. (*See, e.g.*, Doc. 57-11 at 3 [website for https://hymnmultitracks.com, which includes a tab entitled "Buy All 20 Multitracks" for $150].) That these websites employ some version of the word "multitrack" in their domain names supports the conclusion that the term is being used to describe those products and services.

MTC's arguments do not affect this conclusion. MTC's preliminary argument is that CCLI fails to consider the Mark "as a whole" when arguing that it is descriptive. Although MTC is correct that courts must consider the mark "as a whole" when evaluating descriptiveness, the analysis also differs from the genericness context—where the mark as a whole must *name* a specific class—because a mark may be descriptive if, when taken as a whole, it merely "conveys an immediate idea" of the characteristics, function, or purpose

of the goods and/or services offered.  Logically, the addition of a top-level domain such as ".com" would not have the same effect on whether a mark is descriptive as it would on whether a mark is generic (*i.e.*, naming a genus).  Courts have recognized as much.  *TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 101 (2d Cir. 2001) (concluding that the addition of "a top-level domain identifier of '.com,' or '.net'" to a descriptive mark is "of little or no significance" because "consumers would see the domain name 'thechildrensplace.com/.net' as employing functionally the same name as 'The Children's Place'").

In fact, some courts have found that the addition of top-level domain names like ".com" may *add* descriptive content to the mark.  *In re Steelbuilding.com*, 415 F.3d at 1299-1300 ("[T]he [.com] indicator describes a significant feature of applicant's services, namely, the Internet commerce connection.  Thus, the . . . applicant's mark is 'merely descriptive' for the on-line services specified in the application."); *Tranik Enterprises*, 2017 WL 11150925 at *4 ("The Court now finds that the Plaintiff's mark is descriptive, not generic.  The word 'authentic' describes a specific characteristic of the watches sold by the Plaintiff.  Further, the suffix '.com' describes the manner in which the Plaintiff sells watches; namely, that the watches are sold on the internet.  The generic aspect of the mark, 'Watches,' has been sufficiently described in the mark itself to qualify as a descriptive mark.  Taken together, 'AuthenticWatches.com' is a descriptive mark and may be entitled to protection.").  *Cf. Booking.com*, 591 U.S. at 559 (noting that the addition of top-level domain names like .com "might also convey to consumers a source-identifying characteristic: an association with a particular website").  Consequently, when analyzing whether the Mark is descriptive, the Court treats "multitracks.com" and the term "multitracks" as functionally equivalent.

MTC's core argument is that because it offers products and services that are unrelated to multitracks, the Mark cannot be "merely descriptive."  This argument is foreclosed by settled law: "A mark may be merely descriptive even if it does not describe the 'full scope and extent' of the applicant's goods or services."  *In re Oppedahl & Larson*

1    *LLP*, 373 F.3d 1171, 1173 (Fed. Cir. 2004).  *See also In re Dial-A-Mattress Operating*

2    *Corp.*, 240 F.3d 1341, 1346 (Fed. Cir. 2001) ("Dial–A–Mattress argues that its mark is not

3    descriptive because, although it suggests the nature of its services, it does not describe their

4    full scope and extent.  This argument is unavailing because the mark need not recite each

5    feature of the relevant goods or services in detail to be descriptive.").  Indeed, a mark may

6    be found descriptive if it describes *any* of the goods and/or services provided under the

7    mark.   1 McCarthy  on  Trademarks  and  Unfair  Competition § 11:51 (5th ed.) ("The

8    registration should be refused if the term is descriptive of *any* of the goods for which

9    registration is sought.") (emphasis added); *In Re Analog Devices Inc.*, 6 U.S.P.Q.2d 1808

10   (T.T.A.B. 1988) ("[I]t is a well settled legal principle that where a mark may be merely

11   descriptive of one or more items of goods in an application but may be suggestive or even

12   arbitrary as applied to other items, registration is properly refused if the subject matter for

13   registration is descriptive of any of the goods for which registration is sought.").  In short,

14   even if MTC offered some goods and services that are unrelated to multitracks, the Mark

15   could remain descriptive of MTC's goods and services.[13]

16         For these reasons, MTC has failed to demonstrate that the Mark is not descriptive

17   as a matter of law.[14]  The Court thus denies MTC's motion for summary judgment on that

18   issue and turns to CCLI's motion for summary judgment on the issue of secondary

19   meaning.[15]

20   ───────────────

21   [13]    For this reason, it is unnecessary to delve into the parties' briefing concerning
     whether MTC's "other" goods and services are in fact related to its "multitrack" goods and
     services.

22   [14]    MTC's remaining arguments are unavailing.  As with genericness, MTC relies on
23   Ross's testimony in support of the argument that the Mark operates as a source designator.
     (Doc. 61 at 14-15; Doc. 69 at 5-6.)  For the reasons outlined in earlier portions of this order,
24   that argument lacks merit.  MTC also reiterates its contention that the PTO's decision to
     publish the Mark in the Trademark Official Gazette for opposition constitutes evidence of
25   the Mark's validity.  (Doc. 69 at 5.)  This argument fails as to descriptiveness for the same
     reasons it fails as to genericness.

26   [15]    Courts seem to use the terms "secondary meaning" and "acquired distinctiveness"
27   interchangeably in this context.  *Booking.com*, 591 U.S. at 553 ("[T]o be placed on the
     principal register, descriptive terms must achieve significance 'in the minds of the public'
     as identifying the applicant's goods or services—a quality called 'acquired distinctiveness'
28   or 'secondary meaning.'").  For ease of reference, the Court will use "secondary meaning"
     here.

1

E.     **Secondary Meaning**

"Although descriptive terms generally do not enjoy trademark protection, a descriptive term can be protected provided that it has acquired 'secondary meaning' in the minds of consumers, *i.e.*, it has 'become distinctive of the [trademark] applicant's goods in commerce.'" *Filipino Yellow Pages*, 198 F.3d at 1147. "Secondary meaning is directed towards the consumer's attitude about the mark in question: does it denote to him a single thing coming from a single source?  In other words, an applicant must show that in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Snap Inc. v. Vidal*, 750 F. Supp. 3d 1120, 1156 (C.D. Cal. 2024) (cleaned up).  The party seeking trademark protection bears the burden of proving secondary meaning. *Booking.com*, 278 F. Supp. 3d at 919, *overruled on other grounds by Booking.com*, 591 U.S. 549.

In determining whether a descriptive mark has secondary meaning, courts employ a "vigorous evidentiary" standard involving a variety of factors.  *Perini Corp. v. Perini Const., Inc.*, 915 F.2d 121, 125 (4th Cir. 1990).  Those factors include direct consumer testimony; survey evidence; exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant.  *P & P Imports LLC*, 46 F.4th at 961.  "Because of the intensely factual nature of the secondary meaning inquiry, summary judgment is generally disfavored." *Id.* (cleaned up).[16]

CCLI argues that even if the Mark is descriptive rather than generic, "no reasonable juror could conclude that MTC has satisfied the rigorous evidentiary standard required to prove that [the Mark] has acquired distinctiveness."  (Doc. 57 at 7-12.)  In response,

---

[16]     For highly descriptive marks, the standard for establishing secondary meaning is increased.  *In re Steelbuilding.com*, 415 F.3d at 1301 ("The proposed mark is highly descriptive. Therefore, applicant had the burden to show a concomitantly high level of secondary meaning."); *Snap Inc.*, 750 F. Supp. 3d at 1156 ("[T]he more descriptive the term, the better the produced evidence must be—qualitatively or quantitatively—to meet an applicant's overall burden of persuasion even under a preponderance of the evidence standard.").  However, because the outcome at summary judgment does not turn on whether this increased secondary meaning standard should be applied, it is unnecessary to decide whether the Mark should be deemed "descriptive" or "highly descriptive."

although not requesting summary judgment in its favor on the issue, MTC argues that the evidence "amply demonstrates that the Mark has 'acquired distinctiveness' in the marketplace." (Doc. 69 at 7-15.)

Below, the Court considers the parties' arguments as to each factor before considering the totality of the factors.

### 1.  Survey Evidence and Consumer Testimony

### a.  **The Parties' Arguments**

CCLI argues that Dr. Cunningham report is irrelevant to the secondary meaning analysis because she "conducted only a genericness survey" and admitted that the "entire discussion of secondary meaning is a red herring[]" to her analysis. (Doc. 57 at 8-9, citing Doc. 57-32 at 6.)  Alternatively, CCLI argues that "[e]ven if the report were not a red herring to the secondary-meaning analysis," the report is fatally flawed for the reasons outlined above. (*Id.* at 9.)  With respect to consumer testimony, CCLI argues that the Olide and Whincop declarations "unwittingly undermine MTC's attempt to establish secondary meaning" because both declarants appear to suggest that they do not associate the Mark with the official company name of "MultiTracks.com" and therefore "do not know the source of MTC's products." (*Id.* at 9-10.)

In response, MTC argues that CCLI's "unsupported assertion that Dr. Cunningham's report 'has no relevance' is plainly absurd," because "Dr. Cunningham's survey shows that 71% [of] the *Teflon* survey respondents designated the Mark a brand name, well above the threshold needed to support a finding of secondary meaning." (Doc. 69 at 8-9.)  MTC also argues that CCLI's attempt to undermine its consumer testimony is "hair-splitting" and "shows the weakness of [CCLI's] argument" and that "[t]he declarations of [] Whincop and Olide, and the 'source of origin' admissions of Mr. Ross buttress Dr. Cunningham's conclusions and constitute direct evidence that Defendant's Mark has acquired distinctiveness." (*Id.* at 9-10, cleaned up.)

In reply, CCLI argues that MTC fails to address Dr. Cunningham's concession. (Doc. 71 at 3.)  CCLI also reiterates its contention that the Cunningham report's

methodological errors, explained by Dr. Iyengar, undermine its probative value. (*Id.* at 3-4.) Last, CCLI reiterates its argument that the consumer testimony undermines any claim of secondary meaning and is, at any rate, self-serving. (*Id.* at 4-5.)

### b. **Analysis**

Consumer surveys and testimony may provide the strongest evidence of secondary meaning. *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989) ("An expert survey of purchasers can provide the most persuasive evidence of secondary meaning."). For the reasons that follow, the Court concludes that the evidence, when construed in the light most favorable to MTC, creates a genuine dispute of material fact in relation to this factor.

First, although CCLI relies heavily on Dr. Cunningham's statement that "the entire discussion of secondary meaning is a red herring," Dr. Cunningham offered this statement in her rebuttal report in the context of rebutting the criticisms of Dr. Iyengar. (Doc. 57-32 at 6-7.) A reasonable juror could conclude, when considering Dr. Cunningham's challenged comment in context and in conjunction with some of the other passages in her rebuttal report, that Dr. Cunningham did not concede her survey was irrelevant to the issue of secondary meaning—quite the opposite, she emphasized that some scholars consider "secondary meaning and genericness as opposite sides of the same coin" because "[t]hey approach the same issue—namely, whether a term primarily possesses or lacks trademark significance—from two different directions." (*Id.* at 6.) Thus, Dr. Cunningham opined that it would be "reasonable to hypothesize that when a high percentage of 'relevant consumers' consider a name to designate a brand (or trademark) in a genericism survey, similar results may be obtained if one were to survey 'relevant consumers' to assess whether that trademark (or brand) had achieved secondary meaning." (*Id.* at 6-7.) As a result, Dr. Cunningham's report serves as evidence supporting MTC's position on the issue of secondary meaning.

Indeed, although "genericness and secondary meaning are different concepts, they are not easily disentangled." *Snyder's Lance, Inc. v. Frito-Lay N. Am., Inc.*, 542 F. Supp.

3d 371, 400 n.35 (W.D.N.C. 2021).  Thus, "if a *Teflon*-type survey shows that a significant percentage of respondents identify a designation as a 'brand name,' that is not only evidence that it is not a generic name, it is also evidence that the designation has acquired a secondary meaning."  2 McCarthy on Trademarks and Unfair Competition § 12:14 (5th ed.).  *See also Mar. Madness Athletic Ass'n, L.L.C. v. Netfire, Inc.*, 310 F. Supp. 2d 786, 809 (N.D. Tex. 2003), *aff'd sub nom. Mar. Madness Athletic Ass'n LLC v. Netfire Inc.*, 120 F. App'x 540 (5th Cir. 2005) (finding a term had acquired secondary meaning on the basis of the results of a Teflon survey).  Furthermore, although Dr. Cunningham's survey may not have fully carried the day when MTC sought to rely on it as evidence supporting MTC's request for summary judgment on an issue as to which MTC bore the burden of proof, the tables are turned here—CCLI is the only party that has moved for summary judgment on the issue of secondary meaning, so all reasonable inferences must now be resolved in MTC's favor.

Second, for similar reasons, although the statements of Olide and Whincop have various features that preclude them as serving as the basis for an affirmative grant of summary judgment in MTC's favor on the issue of genericness, a factfinder could still conclude, when all reasonable inferences are resolved in MTC's favor, that they provide at least some additional evidence that consumers perceive the Mark to have secondary meaning.  *Application of Automatic Radio Mfg. Co.*, 404 F.2d 1391, 1395 (C.C.P.A. 1969) (finding wholesaler affidavits probative of secondary meaning).[17]

…

…

---

[17]    CCLI's counterargument is that these statements actually "undermine" any claim of secondary meaning because each declarant refers to MTC without mentioning the ".com" appendage, which is "proof that consumers do *not* associate the proposed 'generic.com' mark solely with [MTC]."  (Doc. 57 at 9-10.)  In support, CCLI cites *In re Sausser Summers, PC*, T.T.A.B. Serial No. 88626569 (2021).  The Court finds that decision distinguishable for a host of reasons, including that the declarants' failure to refer to the applicant using its .com modifier was not dispositive and was simply mentioned as one part of a multi-factor analysis.  At any rate, even if the Court were to disregard the Olide and Whincop statements from the ledger of evidence supporting MTC's position on the issue of secondary meaning, there would still be enough remaining evidence to justify the denial of summary judgment.

1        2.        <u>Exclusivity, Manner, And Length Of Use</u>

2            a.    **The Parties' Arguments**

3        CCLI argues that MTC has not exclusively used the Mark, because "it is undisputed

4    that numerous entities have used the word 'multitracks' to describe their products—and

5    even used the words 'multitracks' and '.com' in their domain names."  (Doc. 57 at 10.)

6    CCLI further argues that "[g]iven the highly descriptive nature of a generic.com mark, the

7    use of such a mark for even multiple decades is insufficient to prove that it has acquired

8    distinctiveness."  (*Id.*, cleaned up.)

9        In response, MTC argues that its "substantially exclusive and continuous use of the

10    Mark for over a decade weighs strongly in favor of a finding of secondary meaning" and

11    "has established [MTC] as one of the leading providers of licensed Christian music and

12    related products and services to consumers across the United States and internationally."

13    (Doc. 69 at 10.)

14        In reply, CCLI argues that use of a mark for over a decade does not strongly weigh

15    in favor of secondary meaning where, as here, the mark is "highly descriptive."  (Doc. 71

16    at 5.)  CCLI also reiterates that many entities have used the word "multitracks" to describe

17    their products and used the words "multitracks" and ".com" in their domain names.  (*Id.*)

18            b.    **Analysis**

19        Evidence of "substantially exclusive and continuous use" of a mark "in commerce

20    for the five years before the date on which the claim of distinctiveness is made" may

21    provide *prima facie* evidence of secondary meaning.  15 U.S.C. § 1052(f).  Absolutely

22    exclusive use is not required.  *Snap Inc.*, 750 F. Supp. 3d at 1157 ("After all, 'absolutely

23    exclusive use on the part of the applicant' is not required.") (citation omitted); *Converse,*

24    *Inc. v. Int'l Trade Comm'n Skechers U.S.A.*, Inc., 909 F.3d 1110, 1121 (Fed. Cir. 2018)

25    (collecting cases).  When a mark is highly descriptive, however, this same presumption of

26    secondary meaning is more easily overcome.  *In re Louisiana Fish Fry Prods., Ltd.*, 797

27    F.3d 1332, 1337 (Fed. Cir. 2015) ("Particularly for a mark that is as highly

28    descriptive . . . the Board was within its discretion not to accept Louisiana Fish Fry's

1    alleged five years of substantially exclusive and continuous use as *prima facie* evidence of

2    acquired distinctiveness.").   A claim of secondary meaning is also undermined if "the

3    record shows that purchasers are confronted with more than one (let alone numerous)

4    independent users of a term or device."  *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d

5    1401, 1403 (Fed. Cir. 1984).  *See also Ayoub, Inc. v. ACS Ayoub Carpet Serv.*, 118 USPQ2d

6    1392, 1404 (TTAB 2016) (finding no "substantially exclusive" use where there was

7    widespread third-party use of the mark).

8        Here, the undisputed evidence shows that MTC has made continuous use of the

9    Mark since roughly 2012.  (Doc. 61-1 ¶ 2 ["Since 2012, my company has used the

10   trademark 'MULTITRACKS.COM.'"].  *See also* Doc. 61-1 at 13, 15-16, 18-20, 22-36

11   [showing MTC's use of the Mark at conferences, in advertisements, and on social media

12   since at least 2014]).  The record does not support, however, that MTC's use during this

13   period was "substantially exclusive."  As CCLI notes, many entities have used various

14   combinations of "multitracks" and ".com" in their domain names to describe the goods and

15   services they provide.  (Docs. 57-10 through 57-18.)  Notably, MTC does not address this

16   issue or explain why its use of the Mark could be considered "substantially exclusive"

17   despite this third-party usage.  Consequently, this factor weighs against a finding of

18   secondary meaning.

19        3.    Amount And Manner Of Advertising

20            a.    **The Parties' Arguments**

21        CCLI argues that MTC's advertising expenditures "pale in comparison" to those of

22   the plaintiff in *Booking.com*.  (Doc. 57 at 10.)  CCLI also argues that MTC has "failed to

23   produce evidence establishing how many consumers were *actually* exposed to the

24   purported mark as a result of MTC's advertising."  (*Id.*)  Last, CCLI argues that because

25   "the advertising examples produced by MTC are replete with a composite mark containing

26   a logo next to 'Multitracks.com' . . . one cannot disentangle the source-identifying

27   impression of this composite mark from MULTITRACKS.COM alone."  (*Id.* at 10-11.)

28        In response, MTC argues that the undisputed evidence "shows the tremendous

success of [MTC's][18] advertising efforts," which have cost MTC "millions of dollars" and have resulted in industrywide recognition and association of the Mark with MultiTracks, LLC. (Doc. 69 at 10.) MTC also emphasizes that its advertising efforts have resulted in a social media following of over 261,000 and significantly increased website traffic. (*Id.*) Next, MTC argues that CCLI's comparison to the advertising expenditures in *Booking.com* is unavailing because the litigant in that case operated within an entirely different industry—and "absent from Plaintiff's motion is any fact showing that Defendant's advertising and marketing efforts are facially inadequate in the context of the Christian Music industry." (*Id.* at 10-11.) "More importantly, the Supreme Court did not impose an advertising expenditure minimum as a prerequisite to the application of the analytical rubric adopted in *Booking.com*." (*Id.* at 10.)

In reply, CCLI argues that "[c]ontrary to MTC's claim, CCLI does—and has—disputed MTC's amount and manner of advertising." (Doc. 71 at 6.) CCLI also argues that Edwards's statements purporting to indicate that "all" record labels and artists recognize the Mark fails to establish consumer perception "and in any event, are entitled to no weight—otherwise every litigant could establish secondary meaning by submitting a self-serving declaration of this sort." (*Id.*) CCLI further argues that "MTC's 'social media following' is of no help because its social media sites all prominently display MTC's composite mark—not the purported MULTITRACKS.COM mark—and even prominently display 'MultiTracks' without the '.com' suffix." (*Id.*) Last, CCLI argues that MTC has a duty to explain why its marketing expenditures, "which are 'microscopic' in comparison to those of Booking.com are nonetheless sufficient to establish secondary meaning under *Booking.com*." (*Id.*)

### b.  **Analysis**

To demonstrate secondary meaning based on advertising, the advertising must be of a "nature and extent such as to create an association" with the advertiser's goods. *Dep't of*

---

[18]    MTC here writes "Plaintiff's advertising efforts." The Court presumes this was a mistake and was intended to refer to MTC's own advertising efforts.

*Parks and Recreation v. Bazaar Del Mundo*, 448 F.3d 1118, 1128 (9th Cir. 2006).  The mere "large expenditure of money does not in itself create legally protectable rights." *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 800 (9th Cir. 1970) (citation omitted).  The "true test of secondary meaning" is the effectiveness of the advertising effort.  *Int'l Jensen v. Metrosound U.S.A.*, 4 F.3d 819, 824 (9th Cir. 1993).  "The effectiveness of this advertising can be evident from the success of product sales and need not be directly proven."  *Appliance Liquidation Outlet, L.L.C. v. Axis Supply Corp.*, 105 F.4th 362, 378 (5th Cir. 2024) (cleaned up).

When all reasonable inferences are resolved in MTC's favor as the non-movant, a juror could find that MTC's advertising efforts support the Mark having secondary meaning.  MTC has spent millions of dollars in advertising and marketing expenditures since it began using the Mark.  (Doc. 69 at 10.  *See also* Doc. 59-1 [to be refiled on public docket]).  This alone provides at least *some* evidence of secondary meaning.  *Snap Inc.*, 750 F. Supp. 3d at 1157 ("The limited evidence of Snap's [tens of millions in] advertising expenditures . . . is superficially probative of secondary meaning.").

MTC also provides more than its raw expenditures.  MTC offers a variety of documents demonstrating the multiple avenues through which it carried out its advertising and marketing efforts.  For example, MTC provides documents showing its advertisements and marketing efforts directed toward various Christian music award shows, magazines, conferences, and other events—and through its own social media platforms.  (Doc. 61-1 at 12-67.)  The efforts extend as far back as 2014 (*id.* at 33) and appear to grow more frequent and substantial with time—something to be expected if those efforts were bearing fruit.  MTC further provides undisputed evidence that these efforts resulted in a social media following of over 261,000 people, more than 500,000 customer accounts, and 340,000 unique visits to MTC's website.  (Doc. 61-1 ¶¶ 12-13.)  These facts support MTC's contention that its efforts have been effective at creating an association between the Mark and MTC, which is the "true test" of secondary meaning.  *Int'l Jensen*, 4 F.3d at 824.  *See also Booking.com*, 278 F. Supp. 3d at 919 (concluding that "the number of visual

1   impressions is equally, if not more, probative of secondary meaning [than advertising
2   expenditures] because it more closely approximates the number of consumers who have
3   been exposed to a brand").

4       CCLI's arguments do not alter this conclusion.  First, that MTC's advertising
5   expenditures "pale in comparison" to those in *Booking.com* does not undermine the
6   effectiveness of those efforts.  CCLI provides no authority—nor could the Court find any—
7   suggesting there is a required minimum expenditure.  Nor would such a one-size-fits-all
8   rule make sense given the variety of ways in which one industry may differ from another.
9   *Appliance Liquidation Outlet*, 105 F.4th at 378 ("ALO has presented evidence of
10  advertising in amounts reasonable for a business of its size.  Its sole location is adorned
11  with a massive billboard displaying 'Appliance Liquidation Outlet' prominently.  It also
12  partners with local sports teams to display its name at games.  These advertising efforts
13  have 'creat[ed] an association in the minds of consumers' between ALO's store and the
14  words 'Appliance Liquidation Outlet.'"); *Comm. for Idaho's High Desert, Inc. v. Yost*, 92
15  F.3d 814, 822 (9th Cir. 1996) (affirming a district court's decision that a nonprofit's limited
16  advertising expenditures weighed in favor of secondary meaning: "While the type of
17  'advertising' identified by the district court would be unusual in a trademark dispute
18  involving competing for-profit businesses, it is not inappropriate in a dispute between two
19  non-profit advocacy groups").  CCLI provides nothing in its motion in the way of argument
20  or evidence to suggest that MTC's expenditures are insufficient.

21      CCLI's next argument is that MTC's frequent use of its composite mark ("CM")
22  undermines any claim that the raw Mark has secondary meaning.  When CCLI refers to
23  MTC's composite mark, it refers to the following:



26  According to CCLI, because MTC often uses the CM in its promotional materials, this
27  diminishes the likelihood that consumers associate the raw Mark with MTC, as "one cannot
28  disentangle    the    source-identifying    impression    of    this    composite    mark    from

1    MULTITRACKS.COM alone." (Doc. 57 at 10-11.) CCLI relies on *In re Benjamin* as

2    support for this argument. There, the TTAB concluded that the trademark plaintiff's

3    evidence of advertisements was "undermined by the absence of examples of Applicant's

4    Bing and Yahoo advertisements, Applicant's display of the proposed mark with a red 'R'

5    logo in Google Auction Marketplace advertisements, and the lack of information regarding

6    U.S. consumer exposure to Applicant's website and advertising." *In re Benjamin*, Serial

7    No. 88396223 at 51. The TTAB further noted that "[e]ven considering that consumers

8    would perceive RESERVATIONS.COM as creating a separate commercial impression

9    here . . . we do not know how frequently Applicant uses this particular manner of display."

10   *Id.* at 50.

11       Putting aside the non-precedential nature of *In re Benjamin*, the Court is not

12   convinced that it undermines MTC's proffered evidence of advertising and marketing

13   efforts, particularly at the summary judgment stage where all reasonable inferences must

14   be resolved in MTC's favor. Unlike in *In re Benjamin*, where the TTAB did not know how

15   frequently the plaintiff used the raw mark, the record here includes a substantial number of

16   documents showing MTC's use of the Mark. For example, the record demonstrates that

17   MTC used the Mark as its username on Facebook and Instagram, where it interacts with

18   its hundreds of thousands of followers. (Doc. 61-1 at 22-36.) See the following example

19   from MTC's Instagram:



24   (Doc. 71-3 at 2.)

25       See also the following examples from MTC's Facebook pages at two different

26   periods:



(Doc. 61-1 at 29 [left]; Doc. 71-1 at 2 [right].)

In none of these examples does MTC precisely use the CM. In the first example from Instagram and the more recent example from Facebook, MTC's profile picture contains a negative-colored version of the graphic of the CM but uses the Mark separate and apart from that image. In the earlier example from Facebook, MTC appears not to use any portion of the CM and prominently displays the Mark apart from the logo to its left. A reasonable factfinder could conclude that MTC's use of the raw Mark as its username, separate from the CM, is evidence of usage that could affect consumer association of the Mark with MTC. MTC also uses the raw Mark in a variety of other materials that, although not strictly advertisements, constitute examples of marketing and therefore could be taken to affect consumer association of the Mark with MTC. For example, MTC includes various articles extolling the virtues of MTC, all using the Mark rather than the CM. (Doc. 61-1 at 65-67, 69-103.)

At bottom, when all reasonable inferences are resolved in MTC's favor, a factfinder could conclude that the third factor favors a finding of secondary meaning.

### 4. Amount Of Sales And Number Of Customers

#### a. **The Parties' Arguments**

CCLI argues that MTC has "produced information only regarding the number of accounts and unique visitors on its website," which is, by Edwards's own admission, "not necessarily indicative of sales." (Doc. 57 at 11.) "Moreover, MTC failed to produce evidence regarding its market share or where [its] services rank in the industry in terms of sales." (*Id.*, cleaned up.)

In response, MTC argues that in addition to its 500,000 customer accounts, it serves over 50,000 churches across the country. (Doc. 69 at 11.) MTC also argues that CCLI's

1  reliance on "non-precedential administrative decisions to challenge this clear evidence is

2  wholly ineffectual."  (*Id.*)

3       In reply, CCLI argues that "MTC still fails to point to any evidence establishing its

4  actual amount of sales, rather than 'customer accounts' and website 'visits.'"  (Doc. 71 at

5  6.)  "A reasonable juror cannot 'infer secondary meaning' by 'bridging [MTC's]

6  evidentiary gaps with speculation and conjecture—an impermissible practice incapable of

7  precluding summary judgment.'"  (*Id.*)

8                              b.    **Analysis**

9       MTC's has failed to provide evidence of its sales volume—instead, it apparently

10  seeks to argue that its number of customer accounts (500,000) and the number of churches

11  it services (over 50,000) are proxies for sales.  On the one hand, such figures do provide

12  some support for MTC's position that the Mark has acquired secondary meaning, at least

13  when all reasonable inferences are resolved in MTC's favor as the non-movant.  2

14  McCarthy on Trademarks and Unfair Competition § 15:49 (5th ed.) ("The logical inference

15  is: The larger a company and the greater its sales, the greater the number of people who

16  have been exposed to this designation used as a trademark.  The inference is that these

17  buyers associate the designation with a single source.").  CCLI appears to contend that

18  Edwards conceded that customer accounts are unrelated to sales (Doc. 57 at 11), but this

19  mischaracterizes his statement.    In context, Edwards's statement is simply an

20  acknowledgement that not every person who creates an account goes on to buy something.

21  (Doc. 57-2 at 10-11.)  This obvious fact does not mean, however, that the number of

22  accounts created on MTC's website is irrelevant when assessing sales—it merely reflects

23  that the customer-account figure is an imperfect proxy for sales.

24       On the other hand, even accepting that MTC's proffered evidence may serve as an

25  imperfect proxy for sales, that evidence lacks context.  For sales figures (or in this case,

26  customer numbers) to be indicative of secondary meaning in a particular industry, they

27  must be placed in the context of that industry.  *RVC Floor Decor, Ltd. v. Floor & Decor

28  Outlets of Am., Inc.*, 2024 WL 2847139, *14 (E.D.N.Y. 2024) ("Plaintiff failed to place its

sales figures into context; for example, the record evidence neither shows Plaintiff's market share in the Four-County Area, nor does it frame Plaintiff's 'sales success' with reference to similarly situated competitors.  Therefore, Plaintiff's level of historical 'sales success' is unclear.").  MTC does not offer evidence that its number of customers is impressive relative to its competitors, and this omission diminishes the probative value of its evidence. As a result, and mindful of the "vigorous evidentiary standard" required to establish secondary meaning, the Court finds this factor indeterminate for summary judgment purposes.

     5.    <u>Established Place In The Market</u>

     a.    **The Parties' Arguments**

CCLI omits any mention of this factor in its motion.

In response, MTC argues that CCLI "cannot dispute that [MTC] has been the established market leader for over a decade, and indeed it makes no effort to do so in its motion." (Doc. 69 at 11, citation omitted.)

In reply, CCLI argues that the Ninth Circuit has provided no guidance on what this factor means or how it differs from the others, but "[w]hatever the phrase means, Mr. Edwards'[s] self-congratulatory legal conclusions about his company's place in the market do not establish a genuine issue of material fact." (Doc. 71 at 6-7.)

     b.    **Analysis**

Although MTC does not provide direct evidence of its market share, MTC does offer evidence—in the form of publications, awards, and consumer testimony—that it is an industry leader that has achieved wide recognition in the market. (*See, e.g.*, Doc. 61-1 at 12-67.)  This provides some evidence that MTC has an "established place in the market." CCLI offers nothing to contradict this inference.  CCLI appears only to argue that because the Ninth Circuit has not offered guidance on how to apply this factor, it cannot serve as a basis for avoiding summary judgment.  The Court disagrees, as the Ninth Circuit's decision to enumerate this as a separate factor suggests it may have some independent value in the secondary-meaning calculus—otherwise, there would have been no reason to enumerate it.

1    Accordingly, on this record, the "established place in the market" factor favors a finding

2    of secondary meaning.

3         6.    Intentional Copying

4              a.    **The Parties' Arguments**

5    CCLI argues that "[t]here is zero evidence that third parties have intentionally

6    copied the purported mark MULTITRACKS.COM" and "[i]t is not clear how such

7    intentional copying would be possible, given that 'multitracks' and '.com' are nothing

8    more than the generic and/or descriptive names for a class of products that can be found

9    online." (Doc. 57 at 11.)

10   In response, MTC argues that CCLI misstates the relevant law—namely, that courts

11   "should look to whether [CCLI]—not third parties—copied the Mark." (Doc. 69 at 11.)

12   MTC thus argues that an inference of secondary meaning arises because CCLI "knowingly

13   copied [MTC's] Mark—*i.e.*, purchased a nearly identical domain name to redirect

14   consumers away from [MTC's] products and services." (*Id.* at 11-12.)

15   In reply, CCLI argues that by obtaining the multitrack.com domain name "to

16   accurately describe its own website used to promote the class of products at issue," it did

17   not copy the Mark. (Doc. 71 at 7.) "Moreover, in the absence of 'precise copying' for

18   which there was 'no logical reason' except 'an attempt to realize upon a secondary meaning

19   that is in existence,' a factfinder cannot infer the existence of secondary meaning." (*Id.*)

20             b.    **Analysis**

21   "[P]roof of copying strongly supports an inference of secondary meaning." *Vision*

22   *Sports, Inc.*, 888 F.2d at 615. This is because "[t]here is no logical reason for the precise

23   copying save an attempt to realize upon a secondary meaning that is in existence." *Audio*

24   *Fid., Inc. v. High Fid. Recordings, Inc.*, 283 F.2d 551, 558 (9th Cir. 1960). On the other

25   hand, "close copying does not necessarily indicate that the defendant has attempted to

26   capitalize on the secondary meaning of plaintiff's trademark or trade dress because there

27   may have been many other motivations for defendant's actions." *Brooks Shoe Mfg. Co.,*

28   *Inc. v. Suave Shoe Corp.*, 716 F.2d 854, 860 (11th Cir. 1983) (cleaned up). For example,

a defendant may deliberately copy a descriptive mark because it accurately and succinctly describes the properties of the defendant's goods or services, or for other functional reasons. *See, e.g.*, *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 603, 611 (7th Cir. 1986). *See also Philip Morris, Inc. v. R. J. Reynolds Tobacco Co.*, 1975 WL 21170, *4 (S.D.N.Y. 1975) (no secondary meaning inferred from copying the term "Lights" because that term accurately described defendant's product); *Cont'l Lab'y Prods., Inc. v. Medax Int'l, Inc.*, 114 F. Supp. 2d 992, 1011 (S.D. Cal. 2000) (concluding that intentional copying did not weigh in favor of secondary meaning because "[d]efendants copied the design for functional reasons").

Here, CCLI acquired the domain name multitrack.com for the purpose of having it redirect users to Loop Community, which sold products and services in competition with MTC. (Doc. 61-6 at 10.) The CCLI representative who acquired the domain name, Ross, was aware of the existence of MTC's website, Multitracks.com, and the goods and services offered there. (*Id.* at 11.). The domain name was not, however, a precise copy of the Mark—instead, it was a close copy that omitted the final "s" from the Mark. At trial, the factfinder will have to determine whether this close-copying effort constituted an improper attempt to capitalize on the goodwill that MTC had already established in the Mark (as MTC contends) or a mere attempt to accurately describe Loop Community's offerings (as CCLI contends). For present purposes, the Court must resolve this factual dispute in MTC's favor, and thus the "intentional copying" factor favors a finding of secondary meaning.

### 7.    Unsolicited Media Coverage

#### a.    **The Parties' Arguments**

CCLI argues that MTC's nine proffered publications fail to establish substantial media coverage because "[t]wo of those publications focus on Edwards himself, rather than his company and thus carry no weight," "[t]wo of the remaining seven use only the composite mark and thus have no probative value," and "[t]hree of the remaining five show that MTC itself, and consumers, refer to MTC as 'Multitracks' rather than

'Multitracks.com.' (Doc. 57 at 11.) CCLI, citing *In re Benjamin*, further argues that "even 'eight articles' is 'not a significant amount' when a purported mark has been used for over a decade." (*Id.*) Last, CCLI argues that "MTC has no evidence of the circulation numbers for these publications." (*Id.*)

In response, MTC argues that its nine proffered articles "show that the Mark enjoys unsolicited media coverage" and that "instead of disputing the facts, [CCLI] relies on non-reported, non-precedential, and non-binding authority to challenge the sufficiency of this evidence." (Doc. 69 at 12.)

In reply, CCLI argues that MTC failed to address the "fundamental deficiencies" that CCLI identified with the nine publications. (Doc. 71 at 7-8.) CCLI also argues that many of the publications contain only the CM. (*Id.*) Last, CCLI reiterates its contention that the mention of the Mark in nine publications over the span of ten years is "insufficient to establish secondary meaning as a matter of law." (*Id.* at 8.)

b.    **Analysis**

MTC offers nine publications in an attempt to demonstrate "unsolicited media coverage" of the Mark. (Doc. 57-38 at 2-23; Doc. 61-1 at 48-61.) All of these publications use the Mark in the context of discussing MTC and/or its products and services. (*Id.*) This provides at least *some* evidence of unsolicited media coverage.

CCLI nevertheless contends that because two of the publications focus on Edwards rather than on MTC, they carry no weight. This argument lacks merit, at least at summary judgment. Because those publications explicitly cover Edwards's role in the context of discussing MTC's goods and services, a reasonable factfinder could construe them as evidence of unsolicited media coverage concerning MTC. CCLI also argues that two of the publications use only the CM and thus lack probative value. But although at least one of the referenced publications employs the CM, it *also* employs the raw Mark. (Doc. 57-38 at 4-5.)

At bottom, although MTC's showing of unsolicited media coverage is not overwhelming, a reasonable juror could view this factor as favoring MTC.

- 58 -

8.    Balancing The Factors

Balancing all of these factors, the Court concludes that MTC has presented enough evidence to create genuine factual dispute as to whether the Mark has acquired secondary meaning. A reasonable factfinder could conclude that many of the relevant factors, including the most important factors, favor MTC, and "summary judgment is generally disfavored" with respect to "the secondary meaning inquiry" due to its "intensely factual nature." *P & P Imports LLC*, 46 F.4th at 961. *See generally Narayan v. EGL, Inc.*, 616 F.3d 895, 901 (9th Cir. 2010) ("[I]f we are to have multiple factors, we should also have a trial. A fact-bound approach calling for the balancing of incommensurables, an approach in which no ascertainable legal rule determines a unique outcome, is one in which the trier of fact plays the principal part. That there is a legal overlay to the factual question does not affect the role of the trier of fact.") (cleaned up).

F.    **Bad Faith**

As noted, bad faith is an essential element of a cybersquatting claim under the ACPA. *DSPT Int'l, Inc.*, 624 F.3d at 1218-19 ("The [ACPA] establishes civil liability . . . where a plaintiff proves that . . . the defendant acted 'with bad faith intent to profit from that mark.'"). CCLI argues it is entitled to summary judgment on the issue of bad faith: "Even if MTC could prove that MULTITRACK[S].COM has acquired distinctiveness (it has not), CCLI is still entitled to judgment as a matter of law because MTC cannot prove that CCLI registered the multitrack.com domain name with a bad-faith intent to profit from MTC's purported mark."  (Doc. 57 at 12.)

As an initial matter, CCLI's focus on whether it acted with bad faith when "registering" the domain name multitrack.com is imprecise and potentially confusing. Under the ACPA, three different categories of activity are potentially actionable as cybersquatting: (1) registering a domain name in bad faith; (2) trafficking in a domain name in bad faith; and (3) using a domain name in bad faith. *See* 15 U.S.C. § 1125(d)(1)(A)(ii) ("registers, traffics in, or uses a domain name"). As for the first category, the Ninth Circuit has concluded, after "[l]ooking at ACPA in light of traditional property law, . . . that

Congress meant 'registration' to refer only to the initial registration." *GoPets Ltd. v. Hise*, 657 F.3d 1024, 1031 (9th Cir. 2011). The initial registration of the domain name multitrack.com occurred in the 1990s and was performed by a non-party. When CCLI obtained that domain name in 2021, it did so via a transfer from an earlier registrant. Under *GoPets*, such a transfer is not a "registration." *Id.* at 1032. Thus, although CCLI may be held liable under the ACPA for *using* the domain name in bad faith following the transfer, it cannot be held liable for *registering* the domain name in bad faith. *Cazorla v. Hughes*, 2014 WL 12235425, *10 (C.D. Cal. 2014) ("Although defendants' re-registering of ThePaintedNail.com does not subject them to liability, their subsequent use of the domain name and refusal to return it to The Painted Nail does."). *See generally Lahoti*, 586 F.3d at 1202 ("Evidence of bad faith may arise well after registration of the domain name.").

Presumably for this reason, both sides' pleadings in this case seem to focus on "use" rather than "registration." For example, although CCLI's complaint states that CCLI "registered" the domain name at issue in 2021 (Doc. 1 ¶¶ 19, 21)—an assertion that is difficult to reconcile with *GoPets*—the ultimate form of declaratory relief sought in the complaint is "an order declaring that CCLI's *use* of the domain name multitrack.com is not unlawful, within the meaning of the ACPA." (Doc. 1 at 8, emphasis added.) Likewise, in its counterclaim for cybersquatting under the ACPA, MTC alleges that CCLI "*uses and traffics* in the Domain Name with a bad faith intent." (Doc. 11 at 9 ¶ 10, emphasis added.)

With this backdrop in mind, it is not entirely clear that the Court even possesses authority to grant summary judgment on the issue raised in CCLI's motion, *i.e.*, whether "CCLI registered the multitrack.com domain name with a bad-faith intent to profit." (Doc. 57 at 12.) After all, Rule 56(a) only allows a court to grant summary judgment on a "claim or defense" or "part of [a] claim or defense," and the specific issue raised in CCLI's motion does not appear to be a claim or defense (or even part of a claim or defense) in this case.

At any rate, in keeping with the principle of party presentation, *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020), the Court has done its best in the passages below to evaluate the parties' arguments regarding the issue of bad-faith registration.

When evaluating the presence or absence of bad faith under the ACPA, courts often consider nine statutory factors. 15 U.S.C. § 1125(d)(B)(i). "Congress did not mean these factors to be an exclusive list; instead, the most important grounds for finding bad faith are the unique circumstances of the case, which do not fit neatly into the specific factors enumerated by Congress." *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946-47 (9th Cir. 2002) (cleaned up). "We need not . . . march through the nine factors seriatim because the ACPA itself notes that use of the listed criteria is permissive." *Lahoti*, 586 F.3d at 1202 (cleaned up).

### 1. Trademark Rights

The first statutory factor is "the trademark or other intellectual property rights of the person, if any, in the domain name." 15 U.S.C. § 1125(d)(1)(B)(i)(I).

### a. **The Parties' Arguments**

CCLI argues that because it "has the right—like any purveyor of goods and services—to use generic and/or descriptive terms ('multitrack' and '.com') to describe its products," the first factor weighs against bad faith. (Doc. 57 at 12-13.)

In response, MTC argues that because CCLI offers no evidence that it "has ever used 'multitrack.com' as a trademark or owns any intellectual property rights in the domain name," the Court should, consistent with *Lahoti*, "imply [b]ad faith." (Doc. 69 at 12.)

In reply, CCLI argues that MTC "fails to dispute CCLI's right to use generic and/or descriptive terms to describe its products." (Doc. 71 at 8.) CCLI also argues that MTC's reliance on *Lahoti* is misplaced because the full quotation makes clear that courts will imply bad faith only where the party "never used the [domain name] in connection with *a bona fide offering of goods and services*," which CCLI indisputably has. (*Id.*)

### b. **Analysis**

Although CCLI asserts that it has the "right" to use the domain name multitrack.com to describe its own goods and services, the relevant inquiry under the first factor is simply whether the allegedly infringing party asserts trademark rights in the domain name, which CCLI does not. *See, e.g., Blair v. Automobili Lamborghini SpA*, 2024 WL 4528164, *4

(D. Ariz. 2024); *Newsguy, Inc. v. Yomtobian*, 2004 WL 2944051, *5 (N.D. Cal. 2004) ("Some of the above factors suggest that defendant had a bad faith intent to profit from the *newsguys.com* domain name.  For example, he does not have a trademark in *newsguys* . . . .").  Consequently, the first factor weighs in favor of bad faith.

### 2.    Legal Name Or Common Identifier

The second statutory factor is "the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person."  15 U.S.C. § 1125(d)(1)(B)(i)(II).

#### a.    **The Parties' Arguments**

CCLI asserts that "[n]o one contends that MULTITRACKS.COM is the 'legal name' of any person, so the second factor is inapposite."  (Doc. 57 at 13.)

In response, MTC argues that CCLI's argument on this point "is nonsense," because "[t]he germane inquiry is whether the Mark is indicative of the registrant's nickname or legal name," and here it is not.  (Doc. 69 at 12-13.)

In reply, CCLI reiterates its argument that the Mark is not the legal name of any human being and the second factor is therefore inapposite.  (Doc. 71 at 8-9.)

#### b.    **Analysis**

MTC is correct that the second factor asks whether the relevant domain name is the name or nickname of the alleged cybersquatter.  4 McCarthy on Trademarks and Unfair Competition § 25A:55 (5th ed.).  *See also Blair*, 2024 WL 4528164 at *4 (applying this factor to determine whether the mark "Lambo" was used as a nickname for registrant); *Audi AG v. D'Amato*, 469 F.3d 534, 549 (6th Cir. 2006) (second factor weighed in favor of bad faith where the alleged cybersquatter was named D'Amato and the domain name was audisport.com).  Because CCLI does not argue that multitrack.com is its name (or the name of the current registrant, Ross), this factor weighs in favor of bad faith.

### 3.    Prior Use Of Domain Name In Connection With Bona Fide Offerings

The third statutory factor is "the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services."    15 U.S.C.

1    § 1125(d)(1)(B)(i)(III).

2             a.    **The Parties' Arguments**

3         CCLI argues that "[i]t is undisputed that CCLI, through its affiliated companies,

4    used the terms 'multitrack' and '.com' in connection with the bona fide offering of

5    multitrack products."  (Doc. 57 at 13.)  Moreover, CCLI argues that because it purchased

6    the multitrack.com domain name from a prior registrant who, like CCLI, used that name in

7    connection with a bona fide offering of multitrack services, it inherited "all of the rights"

8    from the prior registrant, meaning that its prior use of multitrack.com predates MTC's use

9    of multitracks.com.  (*Id.*)

10        In response, MTC argues that CCLI misrepresents the nature of the prior registrant's

11   use, which involved offering "a 'Turn Key' service to help small businesses 'develop and

12   maintain a website,' services totally unrelated to music industry." (Doc. 69 at 13.)  MTC's

13   argument appears to be that even if CCLI did inherit the prior registrant's rights in the

14   domain name, those rights do not extend to changes to the original use of the domain name.

15   (*Id.*)

16        In reply, CCLI argues that MTC "cherry pick[ed]" screenshots from the prior

17   registrant's website to suggest that the services offered were unrelated to multitracks, when

18   in fact the evidence demonstrates that "the prior owner also . . . used the domain name to

19   market multitrack goods and services." (Doc. 71 at 9.)

20             b.    **Analysis**

21        The third factor asks whether, at the time of the challenged conduct—here, CCLI's

22   use of the domain name multitrack.com to divert traffic to the website of Loop

23   Community—CCLI had engaged in "prior use" of that domain name for the bona fide sale

24   of goods or services.  *See generally Southern Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d

25   1235, 1247 (11th Cir. 2009) ("The third factor is 'the person's prior use, if any, of the

26   domain name in connection with the bona fide offering of any goods or services.'  3M

27   initially used the diamondbrite.com domain name in connection with the bona fide offering

28   of the product lines it had acquired through its purchase of the American Electronic Sign

Company's assets.  Even though . . . 3M has not made a bona fide offering of goods in connection with the diamondbrite.com domain name since 3M re-registered the domain name after the lapse in its DIAMOND BRITE trademark rights, the statute plainly refers to 'any' prior use.  There was that, so this factor does favor 3M.").

The Court disagrees with CCLI's contention that it "indisputably" engaged in such prior use here.  CCLI does not contend that it has ever used the domain name multitrack.com to sell goods and services, much less that it did so before 2021.  Rather, CCLI focuses on the pre-2021 activities of Loop Community, which CCLI's parent company, StarPraise, acquired in 2020.  But even assuming without deciding that, due to this corporate structure, CCLI might be able to take advantage of Loop Community's pre-2021 activity for purposes of the bad faith analysis, there is no evidence that Loop Community ever used the domain name multitrack.com before 2021 when selling goods and services.

In an effort to show otherwise, CCLI points to deposition testimony that Loop Community used the domain name loopcommunity.com before 2021 to sell multitrack products.  (Doc. 57-3 at 7-8, 10.)  CCLI seems to believe that because Loop Community's domain name ended with .com, and that domain name was used to sell multitrack products, the combination of these two facts shows there was the sort of "prior use" contemplated by the third factor.  (Doc. 57 at 13 ["It is undisputed that CCLI, through its affiliated companies, used the terms 'multitrack' and '.com' in connection with the bona fide offering of multitrack products."].)  But this misunderstands the inquiry under the third factor, which asks whether the alleged cybersquatter had made prior use of "the domain name"— as opposed to the prior use of separate words and phrases that, if hypothetically combined, would equal the domain name—by the time of the challenged conduct.  There is no evidence of such prior use here.[19]

---

[19]    When analyzing secondary-meaning subfactor two, the Court concluded that other companies' use of domain names containing the terms "multitrack" or "multitracks" and ".com" was sufficient to undermine MTC's claim of exclusive use.  Such uses are not to be confused with the sort of use CCLI proffers here, which involves use of the domain name loopcommunity.com to sell multitrack products.  That domain name, unlike the

CCLI's fallback argument—that it effectively steps into the shoes of the prior registrant of the multitrack.com domain name—fares no better.  In support of this argument, CCLI cites *GoPets*.  There, an individual (Hise) registered the domain name gopets.com in 1999, then transferred it to a related company (Digital Overture) in 2006, which proceeded to re-register it.  *GoPets*, 657 F.3d at 1030.  At some point between Hise's initial registration in 1999 and Digital Overture's re-registration in 2006, the plaintiff engaged in efforts to transform its service mark "GoPets" into a distinctive mark.  *Id.*  One issue in *GoPets* was whether Digital Overture's re-registration of the domain name in 2006 constituted cybersquatting in violation of the ACPA.  *Id.*  The Ninth Circuit rejected the cybersquatting claim, holding (as discussed in more detail above) that there can be only one act of "registration" under the ACPA and that the relevant act as to the domain name gopets.com occurred in 1999.  *Id.* at 1032.  This date was significant because a prerequisite to cybersquatting liability under the ACPA is that the protected mark was "distinctive at the time of registration of the domain name."  15 U.S.C. § 1125(d)(1)(A)(ii)(I).  Because the plaintiff's mark was not yet distinctive at the time of Hise's initial registration of the gopets.com domain name in 1999, the cybersquatting claim failed.  *GoPets*, 657 F.3d at 1030.  The Ninth Circuit emphasized that this conclusion was consistent with principles of "traditional property law" because "Hise could have retained all of his rights to gopets.com indefinitely if he had maintained the registration of the domain name in his own name.  We see no basis in ACPA to conclude that a right that belongs to an initial registrant of a currently registered domain name is lost when that name is transferred to another owner.  The general rule is that a property owner may sell all of the rights he holds in property."  *Id.* at 1031.

Although CCLI may be correct that, under *GoPets*, it steps into the shoes of the initial registrant of the multitrack.com domain name for purposes of the temporal inquiry contemplated by § 1125(d)(1)(A)(ii)(I)—that is, whether the Mark was distinctive "at the time of registration of the domain name"—CCLI has not moved for summary judgment on

_____

earlier described ones, does not include the word "multitrack" or "multitracks."

that issue.  Instead, CCLI seeks summary judgment on the separate issue of bad faith, and the text of the third statutory bad-faith factor differs from the statutory provision at issue in *GoPets* in that it does not call for a retrospective look at the state of affairs at the time of initial registration.  Instead, it requires analysis of "*the person's* prior use, if any, of the domain name in connection with the bona fide offering of any goods or services."  15 U.S.C. § 1125(d)(1)(B)(i)(III) (emphasis added).  Other parts of the ACPA confirm that the term "person" in this provision is meant to connote the party being presently accused of cybersquatting through misuse, not the initial registrant.  *Id.* § 1125(d)(1)(A) ("A person shall be liable in a civil action by the owner of a mark . . . if . . . that person . . . .").  Thus, for purposes of the third statutory bad-faith factor, the question is whether, by the time of the challenged conduct at issue (which, here, began in 2021), CCLI had engaged in any prior use of the domain name multitrack.com in connection with the bona fide sale of goods and services.  The answer to that question is no, for the reasons discussed above.  Thus, the third factor weighs in favor of bad faith.

### 4.    Bona Fide Noncommercial Or Fair Use

The fourth statutory factor is "the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name."  15 U.S.C. § 1125(d)(1)(B)(i)(IV).

#### a.    **The Parties' Arguments**

CCLI argues that it "indisputably made 'fair use of the mark in a site accessible under the domain name.'"  (Doc. 57 at 13.)  To support this argument, CCLI notes its "pattern and practice of purchasing 'generic descriptor domains' for its affiliated companies . . . to leverage the inherent power that such generic and descriptive names necessarily have in the marketplace."  (*Id.*)  CCLI argues that treating such activity as fair use is consistent with the rationale behind the fair-use doctrine as set forth in *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004), which "centers on 'the undesirability of allowing anyone to obtain a complete monopoly on use of a descriptive term simply by grabbing it first.'"  (Doc. 57 at 13.)

In response, MTC argues that Ross admitted that CCLI "did not have a *bona fide*

noncommercial or fair use" but was rather motivated by "commercial gain" and also admitted that "he purposefully arranged for any internet users who inadvertently mistyped [MTC's] domain name to be routed to the loopcommunity.com website where they would be presented with 'goods and services in direct competition with [MTC].'" (Doc. 69 at 13.) MTC also cites the Forum arbitrator's decision, which concluded that CCLI's "primary motivation for acquiring the domain name was to use a name similar to that of a key competitor in order to drive traffic to [CCLI's] recently-acquired Loop Community business." (*Id.* at 13-14.) Last, MTC argues that although CCLI "claims it acquired domain names that contained 'descriptive' or 'generic' designations, history tells a different story"—namely, that CCLI wanted to "redirect website traffic from multitrack.com to loopcommunity.com . . . for the purpose of disrupting" MTC's business and "creating a likelihood of confusion" with MTC's Mark. (*Id.* at 14.)

In reply, CCLI argues that MTC conflates the fourth and fifth factors, which is "indicative of the incoherence of its arguments." (Doc. 71 at 9.) Focusing solely on the question of fair use, CCLI argues that MTC has failed to "distinguish the uniform authority holding that the fair-use doctrine applies when a defendant uses generic terms to describe the content of its website." (*Id.*)

b. **Analysis**

When all reasonable inferences are resolved in MTC's favor, a factfinder could reject the notion that CCLI's use of multitrack.com was "bona fide noncommercial or fair use." The analysis as to the "noncommercial" clause of this factor is straightforward. CCLI admits that its decision to use multitrack.com to redirect web traffic to Loop Community's website was made as part of an "ongoing and established" marketing campaign and to "leverage the inherent power" that such descriptive terms have in the marketplace—*i.e.*, to drive more traffic to Loop Community's website, where its affiliate sells multitrack goods and services and competes with MTC. This is not the sort of "noncommercial" use contemplated by Congress or the courts. *See* COMMERCIAL, Black's Law Dictionary (12th ed. 2024) ("Of, relating to, or involving the selling of goods

or services for profit.").

Turning to "fair use," CCLI cites several district court decisions purporting to support the proposition that "the fair use doctrine applies when a defendant uses another's trademark simply to describe the content of defendant's website." (Doc. 57 at 13.)  As an initial matter, CCLI is not "using" multitrack.com "in connection with" or "to describe" *its* goods and services at all.  And even if it were, CCLI is wrong to contend that such use would necessarily mean the use was "fair."  In *KP Permanent Make-Up*—which CCLI cites elsewhere and which postdates all of its cited district court decisions—the Supreme Court stated that "[w]hile we thus recognize that mere risk of confusion will not rule out fair use, we think it would be improvident to go further in this case . . . .  It suffices to realize that our holding that fair use can occur along with some degree of confusion does not foreclose the relevance of the extent of any likely consumer confusion in assessing whether a defendant's use is objectively fair . . . .  Since we do not rule out the pertinence of the degree of consumer confusion under the fair use defense, we likewise do not pass upon the position of the United States, as amicus, that the 'used fairly' requirement in § 1115(b)(4) demands only that the descriptive term describe the goods accurately."  *KP Permanent Make-Up*, 543 U.S. at 123.  The Court interprets this passage as suggesting that a high likelihood of consumer confusion may weigh against fair use, even when a term accurately describes the alleged cybersquatter's goods and services.

Nor does *Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185 (S.D.N.Y. 2022), which CCLI cites in its reply, affect this conclusion.  There, the court concluded that a defendant operating a website under the name "JACKPOT.COM" to market lottery tickets and services had engaged in fair use of that mark.  *Id.* at 270-71.  The court noted that the defendant had "operated a consumer-facing website under the JACKPOT.COM mark for nearly six years; it is logical, indeed expected, that Defendants would want to use the same branding that it uses to serve customers in over 180 countries upon entry into a new market.  Furthermore, the word 'jackpot,' as discussed above, is intimately linked to, and highly descriptive of, the precise product Defendants are offering—lottery tickets.

1   Courts in this district have found that these circumstances do not bespeak bad faith." *Id.*

2   Even were the Court bound by this case, it does not stand for the broad proposition that fair

3   use automatically exists whenever one party uses another party's protected mark to

4   accurately describe its products.

5        For these reasons, when all disputed inferences are resolved in MTC's favor as the

6   nonmovant, a reasonable factfinder could conclude that the fourth factor weighs in favor

7   of bad faith.

8                    5.   Intent To Confuse And Divert Consumers

9        The fifth statutory factor is "the person's intent to divert consumers from the mark

10   owner's online location to a site accessible under the domain name that could harm the

11   goodwill represented by the mark, either for commercial gain or with the intent to tarnish

12   or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship,

13   affiliation, or endorsement of the site."  15 U.S.C. § 1125(d)(1)(B)(i)(V).

14                    a.   **The Parties' Arguments**

15        CCLI argues there is no evidence it sought to divert customers by creating a

16   likelihood of confusion.  (Doc. 57 at 14.)  CCLI also disputes MTC's characterization of

17   its conduct as "typosquatting"—that is, registering intentional misspellings of famous

18   trademarks or names—because "'multitrack.com' is not a misspelling; it is a permissible

19   and correct spelling of a generic.com domain address."  (*Id.*)  Last, CCLI argues that any

20   confusion between the two marks is within the scope of what the Supreme Court tolerates

21   when it comes to descriptive names chosen as marks.  (*Id.* at 14-15.)  As part of this

22   argument, CCLI cites a colloquy between Justice Alito and Booking.com's counsel from

23   the oral argument in *Booking.com* in which counsel seemed to concede that Booking.com

24   would have no right to sue another party on the basis of a "slight variation" of its mark.

25   (*Id.* at 15.)

26        In response, MTC reiterates its arguments regarding the fourth factor.  (Doc. 69 at

27   13-14.)

28        In reply, CCLI argues that MTC failed to acknowledge or dispute that its

1  typosquatting argument "fails as a matter of law under the *Booking.com* decision given that

2  'multitrack.com' is a permissible and correct spelling of a 'generic.com' domain address."

3  (Doc. 71 at 10.)  CCLI next argues that MTC's characterization of Ross's testimony "is

4  false" and that "the cited testimony contains no such admission of typosquatting."  (*Id.*)

5  Last, CCLI argues that "MTC's reliance on the FORUM panelist decision likewise fails as

6  a matter of law; the decision is not evidence and is not entitled to deference."  (*Id.*)

7  b.  **Analysis**

8  Factor five "is rarely discernable directly" and "'must typically be inferred from

9  pertinent facts and circumstances.'" *Audi AG*, 469 F.3d at 549.

10  Here, a reasonable factfinder could view the facts as giving rise to an inference of

11  intent to confuse and divert consumers.  Ross, CCLI's CEO, acquired multitrack.com not

12  long after CCLI's parent company acquiring MTC's direct competitor, Loop Community.

13  Ross admits that, before obtaining the domain name, he became aware that MTC operated

14  its website by the name multitracks.com and offered competing goods and services at that

15  site.  (Doc. 61-6 at 11.)  Upon acquiring multitrack.com, CCLI initially used it to redirect

16  visitors to Loop Community's website, on which Loop Community sold competing goods

17  and services.  (*Id.* at 10.).  Courts have found that similar conduct is indicative of an intent

18  to confuse consumers.  *Spectrum Ass'n Mgmt. of Texas, L.L.C. v. Lifetime HOA Mgmt.*

19  *L.L.C.*, 5 F.4th 560, 566 (5th Cir. 2021) ("[T]he Lifetime Defendants violated Spectrum's

20  trademarks willfully and in bad faith by engaging in the following conduct: . . . registering

21  the Infringing Domain with prior knowledge of Spectrum's trademarks . . . and setting up

22  the Infringing Domain to confuse and divert internet users who sought Spectrum's

23  services."); *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1062 (9th

24  Cir. 1999) ("West Coast's use of 'moviebuff.com' in metatags will still result in what is

25  known as initial interest confusion.  Web surfers looking for Brookfield's 'MovieBuff'

26  products who are taken by a search engine to 'westcoastvideo.com' will find a database

27  similar enough to 'MovieBuff' such that a sizeable number of consumers who were

28  originally looking for Brookfield's product will simply decide to utilize West Coast's

offerings instead. Although there is no source confusion in the sense that consumers know they are patronizing West Coast rather than Brookfield, there is nevertheless initial interest confusion in the sense that, by using 'moviebuff.com' or 'MovieBuff' to divert people looking for 'MovieBuff' to its web site, West Coast improperly benefits from the goodwill that Brookfield developed in its mark.").

A reasonable factfinder could also conclude that <u>multitrack.com</u> is "confusingly similar" to the Mark.[20] After all, the absence of one plural "s" is a minor change. Moreover, "similarity here is judged not just by appearances, but by the likelihood that a particular domain name might be typed in accidently by someone trying to type in one of Plaintiffs' marks or domain names." *Verizon California Inc. v. Navigation Catalyst Sys., Inc.*, 568 F. Supp. 2d 1088, 1095 (C.D. Cal. 2008). CCLI does not dispute that a consumer seeking to purchase a product from MTC might easily misspell <u>multitracks.com</u> and end up on <u>multitrack.com</u>, and a reasonable juror could conclude that such a mistake is likely. Courts have inferred bad faith from the use of domain names with comparable degrees of similarity to an existing mark. *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 207 (6th Cir. 2004) ("[I]t can be inferred that the defendants intended to divert customers from the plaintiff's website from the fact that the defendants' 'foradodge' domain name is phonetically identical to plaintiff's 4ADODGE mark."). A reasonable juror could thus infer from these facts that CCLI obtained the <u>multitrack.com</u> domain name with the intent to divert consumers from MTC's website for commercial gain and to create a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site.

Of course, CCLI disputes this inference and contends it acted with the honest intent of accurately describing its own products and services (or, more precisely, the products and services of Loop Community). Such a conclusion is possible, especially in light of the

---

[20] CCLI argues that <u>multitrack.com</u> is not a misspelling and therefore cannot be an example of "typo-squatting." (Doc. 57 at 19.) This argument is unavailing. Although misspellings may be common indicators of typo-squatting violations, typo-squatting merely requires "registering a domain name that is *but a letter or two off* from a distinctive mark." *Green v. Fornario*, 486 F.3d 100, 103 n.5 (3d Cir. 2007) (emphasis added). "A *slight spelling variation* will not prevent a finding of confusing similarity." 4 McCarthy on Trademarks and Unfair Competition § 25A:51 (5th ed.) (emphasis added).

principle that owners of descriptive marks should expect to tolerate some degree of consumer confusion.  *KP Permanent Make-Up, Inc.*, 543 U.S. at 122 ("The common law's tolerance of a certain degree of confusion on the part of consumers followed from the very fact that in cases like this one an originally descriptive term was selected to be used as a mark, not to mention the undesirability of allowing anyone to obtain a complete monopoly on use of a descriptive term simply by grabbing it first.").  Nevertheless, resolving disputed inferences over one party's intent is what trials are for.  For summary judgment purposes, the fifth factor weighs in favor of bad faith.

### 6.    Offer To Sell Domain Name

The sixth statutory factor is "the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct."  15 U.S.C. § 1125(d)(1)(B)(i)(VI).

### a.    **The Parties' Arguments**

CCLI argues that no evidence exists that it has ever offered to transfer, sell, or otherwise assign the domain name for financial gain.  (Doc. 57 at 15.)

In response, MTC does not address the sixth factor generally or this argument specifically.

In reply, CCLI argues that "[b]y failing to address the sixth factor, MTC effectively concedes this factor weighs against any finding of bad faith as a matter of law."  (Doc. 71 at 10.)

### b.    **Analysis**

By not addressing CCLI's contention that CCLI never "offer[ed] to transfer, sell, or otherwise assign the domain name," MTC effectively concedes this fact.  Fed. R. Civ. P. 56 (e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.")  Regardless, upon reviewing the record, the

1  Court agrees with CCLI's contention and thus concludes that the sixth factor weighs

2  against a finding of bad faith.

3  7.    False Contact Information

4  The seventh statutory factor is "the person's provision of material and misleading

5  false contact information when applying for the registration of the domain name, the

6  person's intentional failure to maintain accurate contact information, or the person's prior

7  conduct indicating a pattern of such conduct."  15 U.S.C. § 1125(d)(1)(B)(i)(VII).

8  a.    **The Parties' Arguments**

9  CCLI argues that "[t]he undisputed facts establish that CCLI did not provide

10  'material and misleading false contact information' to GoDaddy when registering the

11  domain name."  (Doc. 57 at 15.)  CCLI further argues that although MTC "has tried to

12  make much of GoDaddy's erroneous recording of the registrant as 'George George,'" Ross

13  testified that he did not make that decision and this testimony is the only evidence in the

14  record on this point.  (*Id.* at 16.)  Last, CCLI argues that "it is nonsensical to claim that

15  Ross sought to provide 'material' or 'misleading' information" because "[i]f Ross sought

16  to mislead, he would not have used his real first name and a StarPraise email account."

17  (*Id.*)

18  In response, MTC argues that CCLI's registration of multitrack.com under the

19  "George George" name, instead of under the account name that it used when registering

20  six other domain names, shows that it provided deliberately misleading or false contact

21  information.  (Doc. 69 at 14.)  MTC further argues that CCLI's "inaction also implies bad

22  faith—it was perfectly happy to leave obscure the identi[t]y of the 'multitrack.com' domain

23  name owner and employ a non-CLLI email address for the technical contact."  (*Id.*)

24  In reply, CCLI emphasizes that "MTC has not put forward any evidence refuting

25  Mr. Ross's testimony that GoDaddy made an error" and that CCLI's cited evidence

26  "supports only the *opposite* inference."  (Doc. 71 at 10.)  CCLI further explains that the

27  account under which it registered the six other domain names, Domains By Proxy, LLC, is

28  a privacy service meant to protect the identity of its users—and that "[h]ad Mr. Ross

1    intended to obscure the name of the registrant for multitrack.com, he would have used

2    Domains By Proxy, LLC—not his own first name." (*Id.*)  Last, CCLI argues that its alleged

3    "inaction" does not indicate bad faith because at the time it filed its complaint, the domain

4    name was "'locked' under the UDRP rules, thus precluding any changes.  (*Id.*)

5                    b.    **Analysis**

6           On the one hand, the facts surrounding the contact information for the

7    multitrack.com domain name are indeed strange.  In registering most of CCLI's domain

8    names, Ross did so under one account name ("Domains By Proxy, LLC"), whereas the

9    multitrack.com domain name is now registered under the account name "George George"

10   and for the registrant organization "George."  (Doc. 57-24 ¶ 4.)  "George George" is not

11   the name of any registrant, nor is "George" the name of any relevant organization.  Courts

12   have found the presence of false contact information and false registrant information to be

13   indicative of bad faith.  *DaimlerChrysler*, 388 F.3d at 207 ("[T]he defendants provided

14   misleading contact information as the site's registrant, initially listing the registrant as The

15   Net Inc., of Hewlett, New York, while no such entity exists.").

16          On the other hand, Ross has avowed that he provided accurate contact information

17   during the re-registration process, only for GoDaddy to inexplicably utilize the "George

18   George" and "George" names discussed above.  (Doc. 57-24 ¶ 5.)  Additionally, CCLI

19   raises the common-sense point that if Ross were truly interested in concealing his identity

20   or connection to the domain name, he could have just identified Domains By Proxy as the

21   registrant (and certainly wouldn't have used his own name).

22          This strikes the Court as a situation where summary judgment would be

23   unwarranted—the task of sorting out which inferences to draw from odd and arguably

24   conflicting facts is usually reserved for the factfinder at trial.  But even if CCLI were correct

25   that the undisputed evidence—MTC makes no effort to come forward with evidence

26   contradicting Ross's account of why the inaccurate registration details must be a product

27   of an error committed by GoDaddy—compels a finding in CCLI's favor as to the seventh

28   bad-faith factor, this would not change the overall bad-faith calculus given the presence of

1    multiple other statutory factors that must be resolved, at summary judgment, in MTC's
2    favor.

3                8.    Multiple Domains

4        The eighth statutory factor is "the person's registration or acquisition of multiple
5    domain names which the person knows are identical or confusingly similar to marks of
6    others that are distinctive at the time of registration of such domain names, or dilutive of
7    famous marks of others that are famous at the time of registration of such domain names,
8    without regard to the goods or services of the parties."  15 U.S.C. § 1125(d)(1)(B)(i)(VIII).

9                a.    **The Parties' Arguments**

10       CCLI argues that "[t]here is zero evidence that CCLI has registered or acquired
11    multiple domain names which the person knows are identical or confusingly similar to
12    marks of others."  (Doc. 57 at 16, cleaned up.)

13       In response, MTC argues that CCLI's prior registration of the domain name
14    churchstreaminglicense.com, despite knowing that MTC held the federally registered
15    trademark "CHURCH STREAMING LICENSE," weighs in favor of bad faith.  (Doc. 69
16    at 15.)

17       In reply, CCLI argues that registration only offends under this factor if the other
18    mark is distinctive "at the time of registration," and MTC fails to mention that CCLI
19    acquired and used the domain name churchstreaminglicense.com in commerce as early as
20    March    10,    2011—"long    before    MTC's    first    use    in    commerce    of
21    CHURCHSTREAMINGLICENSE on June 27, 2022."  (Doc. 71 at 11.)

22                b.    **Analysis**

23       The    record    establishes    that    CCLI    created    and    registered    the
24    churchstreaminglicense.com domain name in 2010.  (Doc. 71-6 at 2.)  MTC did not begin
25    using the "Church Streaming License" mark in commerce until June 2022 and did not
26    register it with the PTO until January 2024.  (Doc. 69-1 at 44.)  The eight factor thus weighs
27    against a finding of bad faith.

28       …

9.    <u>Whether Incorporated Mark Is Distinctive Or Famous</u>

The ninth statutory factor is "the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)."  15 U.S.C. § 1125(d)(1)(B)(i)(IX).

a.    **The Parties' Arguments**

CCLI argues that "[t]he final factor weighs heavily against any finding of bad faith because, for all of the reasons explained above in Section I, the purported mark MULTITRACKS.COM does not have acquired distinctiveness."  (Doc. 57 at 16.)

MTC argues that "[t]he final factor weighs heavily in favor of bad faith because, for all of the reasons [already] stated . . . [the] Mark is neither generic nor merely descriptive, but has acquired secondary meaning."  (Doc. 69 at 15.)

CCLI reiterates its arguments in reply.  (Doc. 71 at 11.)

b.    **Analysis**

Because, for the reasons outlined in the earlier portions of this order, a genuine dispute of material fact exists as to whether MTC has shown secondary meaning, this factor does not weigh in either direction.

10.    <u>Balancing The Factors</u>

Considering all of the statutory factors, there is more than enough evidence of bad faith to allow MTC to survive summary judgment as to that issue.  A reasonable factfinder could conclude that a majority of the factors weigh in favor of bad faith and intent is, at any rate, an "elusive factual question" almost always best suited for resolution by the factfinder at trial.  *Perez v. Curcio*, 841 F.2d 255, 258 (9th Cir. 1988).

G.    **ACPA Safe Harbor**

Even where the nine bad-faith factors weigh in favor of bad faith, the ACPA contains a "safe harbor" clause that provides: "Bad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful."  15 U.S.C. § 1125(d)(1)(B)(ii).  According to a leading

treatise on trademark law, "[t]his might be nicknamed the 'pure heart and empty head defense' because it might appear to reward the naïve cybersquatter who intended no harm and mistakenly thought that his or her conduct was lawful.  This defense has the potential to reward both ignorance of the law and unawareness of the fact that cybersquatting violates widely accepted standards of fair competition.  Therefore, a court should, in the author's view, make use of this 'reasonable belief' defense very sparingly and only in the most unusual cases."  4 McCarthy on Trademarks and Unfair Competition § 25A:63 (5th ed.).  "We have cautioned that the safe harbor defense should be invoked very sparingly and only in the most unusual cases.  A defendant who acts even partially in bad faith cannot successfully assert a safe harbor defense."  *GoPets Ltd.*, 657 F.3d at 1033 (cleaned up).

## 1.    The Parties' Arguments

CCLI argues that "[t]he undisputed facts establish that CCLI's registration of the multitrack.com domain is subject to the ACPA's 'safe harbor'" provision.  (Doc. 57 at 16.)  CCLI argues that although the safe-harbor provision applies only in "the most unusual cases," the present case "is precisely such an 'unusual case'" because "[u]nlike the typical ACPA case, (1) MTC had no registration on the Principal Register at the time CCLI registered the domain name; (2) the Supreme Court only recently held in *Booking.com* that generic.com domain names are protectable at all and everyone involved agreed such marks are weak; (3) MTC is nothing like Booking.com in terms of its size and scale; and (4) to this day, no federal court has held—or suggested—that registering a generic.com domain name as a descriptive term for selling the class of products at issue on a website violates the ACPA."  (*Id.* at 16-17, emphasis added.)

In response, MTC argues that "courts should make use of this 'reasonable belief' defense very sparingly and only in the most unusual cases.  Here, because Plaintiff plainly acted in bad faith, it cannot avail itself of the narrow safe harbor provisions in the ACPA."  (Doc. 69 at 15, cleaned up.)

In reply, CCLI reiterates its arguments and contends that "MTC does not dispute, or even attempt to dispute, the key facts establishing CCLI's 'safe harbor' defense," and

therefore "[n]o reasonable juror could draw a conclusion that CCLI did not believe, and have reasonable grounds to believe, that its use of the 'generic.com' domain name was lawful." (Doc. 71 at 11.)

        2.    <u>Analysis</u>

For the reasons outlined in the previous section, the record contains facts sufficient to support a determination that CCLI re-registered and used the domain name <u>multitrack.com</u> with a bad-faith intent to profit from the goodwill associated with the Mark. Moreover, CCLI is a sophisticated party with admitted knowledge of MTC's Mark and services—not the sort of pure-hearted and empty-headed registrant contemplated by the safe-harbor provision. Consequently, and in light of courts' reluctance to apply this defense, CCLI has not established entitlement to safe-harbor protection as a matter of law.

Accordingly,

**IT IS ORDERED** that:

1.    The parties' stipulation to file documents under seal (Doc. 58) is **denied**. Within five days of the issuance of this order, CCLI shall resubmit its unredacted summary judgment motion and unredacted versions of Exhibits 35 and 38 to its summary judgment motion.

2.    MTC's motion to exclude Dr. Iyengar (Doc. 60) is **denied**.

3.    CCLI's motion for summary judgment (Doc. 57) is **granted in part and denied in part**.

4.    MTC's motion for partial summary judgment (Doc. 61) **denied**.

Dated this 6th day of June, 2025.

_____
Dominic W. Lanza
United States District Judge